# IN RE OLIVER.

No. 215.   Argued December 16, 1947.—Decided March 8, 1948.

*Osmond K. Fraenkel* and *William Henry Gallagher* argued the cause for petitioner. With them on the brief were *Louis M. Hopping* and *Elmer H. Groefsema*.

*Edmund E. Shepherd,* Solicitor General, argued the cause for the State of Michigan, respondent. With him on the brief were *Eugene F. Black,* Attorney General, *H. H. Warner* and *Daniel J. O'Hara,* Assistant Attorneys General.

*Harry G. Gault* and *Wilber M. Brucker* filed a brief for the State Bar of Michigan as *amicus curiae.*

*Patrick H. O'Brien* and *Erwin B. Ellmann* filed a brief for the Detroit Chapter, National Lawyers Guild, as *amicus curiae,* urging reversal.

MR. JUSTICE BLACK delivered the opinion of the Court.

A Michigan circuit judge summarily sent the petitioner to jail for contempt of court. We must determine whether he was denied the procedural due process guaranteed by the Fourteenth Amendment.

In obedience to a subpoena the petitioner appeared as a witness before a Michigan circuit judge who was then conducting, in accordance with Michigan law, a "one-man grand jury" investigation into alleged gambling and official corruption. The investigation presumably took place in the judge's chambers, though that is not certain.

Two other circuit judges were present in an advisory capacity.[1] A prosecutor may have been present. A stenographer was most likely there. The record does not show what other members, if any, of the judge's investigatorial staff participated in the proceedings. It is certain, however, that the public was excluded—the questioning was secret in accordance with the traditional grand jury method.

After petitioner had given certain testimony, the judge-grand jury, still in secret session, told petitioner that neither he nor his advisors believed petitioner's story— that it did not "jell." This belief of the judge-grand jury was not based entirely on what the petitioner had testified. As will later be seen, it rested in part on beliefs or suspicions of the judge-jury derived from the testimony of at least one other witness who had previously given evidence in secret. Petitioner had not been present when that witness testified and so far as appears was not even aware that he had testified. Based on its beliefs thus formed—that petitioner's story did not "jell"—the judge-grand jury immediately charged him with contempt, immediately convicted him, and immediately sentenced him to sixty days in jail. Under these circumstances of haste and secrecy, petitioner, of course, had no chance to enjoy the benefits of counsel, no chance to prepare his defense, and no opportunity either to cross-examine the other grand jury witness or to summon witnesses to refute the charge against him.

Three days later a lawyer filed on petitioner's behalf in the Michigan Supreme Court the petition for habeas corpus now under consideration. It alleged among other

---

[1] Under certain circumstances Michigan law permits circuit judges to sit with other circuit judges in an advisory capacity. Mich. Stat. Ann. § 27.188 (Henderson 1938); Mich. Comp. Laws 1929 § 13666.

things that the petitioner's attorney had not been allowed to confer with him and that, to the best of the attorney's knowledge, the petitioner was not held in jail under any judgment, decree or execution, and was "not confined by virtue of any legal commitment directed to the sheriff as required by law." An order was then entered signed by the circuit judge that he had while "sitting as a One-Man Grand Jury" convicted the petitioner of contempt of court because petitioner had testified "evasively" and had given "contradictory answers" to questions. The order directed that petitioner "be confined in the County Jail . . . for a period of sixty (60) days or until such time as he . . . shall appear and answer the questions heretofore propounded to him by this Court . . . ."

The Supreme Court of Michigan, on grounds detailed in the companion case of *In re Hartley,* 317 Mich. 441, 27 N. W. 2d 48,[2] rejected petitioner's contention that the summary manner in which he had been sentenced to jail in the secrecy of the grand jury chamber had deprived him of his liberty without affording him the kind of notice, opportunity to defend himself, and trial which the due process clause of the Fourteenth Amendment

---

[2] In giving reasons in its *Hartley* opinion for rejecting this petitioner's constitutional contentions, the State Supreme Court said it would have been an "idle gesture to require such adjournment of the grand jury and its reconvening as a circuit court. The circuit judge, while acting as a one-man grand jury may, in appropriate cases, summarily adjudge a witness testifying before him guilty of contempt and impose sentence forthwith.

"Plaintiff's contempt, if any, was committed in the face of the court and required no extraneous proofs as to its occurrence. It was direct and there was, therefore, no necessity for filing of charges, notice to accused and hearing as provided in 3 Comp. Laws of 1929, § 13912 (Stat. Ann. § 27.513). It was properly dealt with summarily. 3 Comp. Laws 1929, §§ 13910, 13911 (Stat. Ann. §§ 27.511, 27.512)." 317 Mich. at 444–445, 27 N. W. 2d at 50.

requires.[3] *In re Oliver,* 318 Mich. 7, 27 N. W. 2d 323. We granted certiorari to consider these procedural due process questions.

The case requires a brief explanation of Michigan's unique one-man grand jury system.[4] That state's first constitution (1835), like the Fifth Amendment to the Federal Constitution, required that most criminal prosecutions be begun by presentment or indictment of a grand jury. Art. I, § 11. This compulsory provision was left out of the 1850 constitution and from the present constitution (1908). However, Michigan judges may still in their discretion summon grand juries, but we are told by the attorney general that this discretion is rarely exercised and that the "One-Man Grand Jury" has taken the place of the old Michigan 16 to 23-member grand jury, particularly in probes of alleged misconduct of public officials.

The one-man grand jury law was passed in 1917 following a recommendation of the State Bar Association that, in

---

[3] By a four to four vote the court also held that there was "evidence to support the finding" of the judge-grand jury that petitioner had testified falsely. Petitioner has argued here that there was not a shred of evidence which under any circumstances could have conceivably supported this finding and thus that he was deprived of his liberty without due process of law. In the view that we take of this case we find it unnecessary to consider this constitutional contention.

[4] The laws authorizing the system are found in Michigan Comp. Laws 1929, § 17217, *et seq.;* Mich. Stat. Ann. § 28.943, *et seq.* (Henderson 1938). A summary of the ten states' statutes which have some similarities to Michigan's appears in Winters, *The Michigan One-Man Grand Jury,* 28 J. Am. Jud. Soc. 137. See, *e. g.,* Conn. Gen. Stat. § 889f (Supp. 1941); *McCarthy* v. *Clancy,* 110 Conn. 482, 148 A. 551; Okla. Stat. Ann. tit. 37, § 83; tit. 21 § 951 (1937); *Ex parte Ballew,* 20 Okla. Cr. 105, 201 P. 525.

the interest of more rigorous law enforcement, greater emphasis should be put upon the "investigative procedure" for "probing" and for "detecting" crime.[5]   With this need uppermost in its thinking the Bar Association recommended a bill which provided that justices of the peace be vested with the inquisitorial powers traditionally conferred only on coroners and grand juries.   The bill as passed imposed the recommended investigatory powers not only on justices of the peace, but on police judges and judges of courts of record as well.   Mich. Laws 1917, Act 196.

Whenever this judge-grand jury may summon a witness to appear, it is his duty to go and to answer all material questions that do not incriminate him.   Should he fail to appear, fail to answer material questions, or should the judge-grand jury believe his evidence false and evasive, or deliberately contradictory, he may be found guilty of contempt.   This offense may be punishable by a fine of not more than one hundred dollars, or imprisonment in the county jail not exceeding sixty days, or both, at the discretion of the judge-grand jury.   If after having been so sentenced he appears and satisfactorily answers the questions propounded by the judge-jury, his sentence may, within the judge-jury's discretion, be commuted or suspended.   At the end of his first sentence he can be resummoned and subjected to the same inquiries.   Should the judge-jury again believe his answers false and evasive, or contradictory, he can be sentenced to serve sixty days more unless he reappears before the judge-jury during the second 60-day period and satisfactorily answers the questions, and the judge-jury within

---

[5] Proceedings of the Twenty-sixth Annual Meeting of the Michigan State Bar Association 101–105 (1916).

its discretion then decides to commute or suspend his sentence.[6]

In carrying out this authority a judge-grand jury is authorized to appoint its own prosecutors, detectives and aides at public expense,[7] all or any of whom may, at the discretion of the justice of the peace or judge, be admitted to the inquiry. Mich. Stat. Ann. § 28.944 (Henderson 1938). A witness may be asked questions on all subjects and need not be advised of his privilege against self-incrimination, even though the questioning is in secret.[8] And these secret interrogations can be carried on day or night, in a public place or a "hideout," a courthouse, an office building, a hotel room, a home, or a place of business; so well is this ambulatory power understood in Michigan that the one-man grand jury is also popularly referred to as the "portable grand jury."[9]

It was a circuit court judge-grand jury before which petitioner testified. That judge-jury filed in the State Supreme Court an answer to this petition for habeas corpus. The answer contained fragments of what was apparently a stenographic transcript of petitioner's testimony given before the grand jury. It was these fragments of testimony, so the answer stated, that the "Grand

[6] *In re Ward*, 295 Mich. 742, 747, 295 N. W. 483, 485. (First 60-day conviction May 31, 1940, followed by second 60-day conviction July 29, 1940. A $100 fine was also imposed in each instance.)

[7] *In re Investigation of Recount*, 270 Mich. 328, 331, 258 N. W. 776, 777; *In re Slattery*, 310 Mich. 458, 479, 17 N. W. 2d 251, 259.

[8] *People* v. *Wolfson*, 264 Mich. 409, 413, 250 N. W. 260, 262; *In re Watson*, 293 Mich. 263, 269, 291 N. W. 652, 655; *People* v. *Butler*, 221 Mich. 626, 631–632, 192 N. W. 685, 687.

[9] Winters, *The Michigan One-Man Grand Jury*, 28 J. Am. Jud. Soc. 137, 143; *Unprecedented Success in Criminal Courts*, 26 J. Am. Jud. Soc. 42–43.

Jury" had concluded to be "false and evasive." The petitioner then filed a verified motion with the State Supreme Court seeking to have the complete transcript of his testimony before the judge-jury produced for the habeas corpus hearing. He alleged that a full report of his testimony would disclose that he had freely, promptly, and to the best of his ability, answered all questions asked, and that the full transcript would refute the charge that he had testified evasively or falsely. In his answer to the motion the circuit judge did not deny these allegations. However, he asserted that the fragments contained in the original answer showed "all of the Grand Jury testimony necessary to the present proceeding" and that "the full disclosure of Petitioner's testimony would seriously retard Grand Jury activities." The State Supreme Court then denied the petitioner's motion. Thus, when that Court later dismissed the petition for habeas corpus it had seen only a copy of a portion of the record of the testimony given by the petitioner.

The petitioner does not here challenge the constitutional power of Michigan to grant traditional inquisitorial grand jury power to a single judge, and therefore we do not concern ourselves with that question. It has long been recognized in this country however that the traditional 12 to 23-member grand juries may examine witnesses in secret sessions. Oaths of secrecy are ordinarily taken both by the members of such grand juries and by witnesses before them. Many reasons have been advanced to support grand jury secrecy. See, *e. g.,* *Hale* v. *Henkel,* 201 U. S. 43, 58–66; *State* v. *Branch,* 68 N. C. 186. But those reasons have never been thought to justify secrecy in the trial of an accused charged with violation of law for which he may be fined or sent to jail. Grand juries investigate, and the usual end of their investigation is either a report, a "no-bill" or an indictment.

They do not try and they do not convict. They render no judgment. When their work is finished by the return of an indictment, it cannot be used as evidence against the person indicted. Nor may he be fined or sentenced to jail until he has been tried and convicted after having been afforded the procedural safeguards required by due process of law. Even when witnesses before grand juries refuse to answer proper questions, the grand juries do not adjudge the witnesses guilty of contempt of court in secret or in public or at all.[10] Witnesses who refuse to testify before grand juries are tried on contempt charges before judges sitting in open court. And though the powers of a judge even when acting as a one-man grand jury may be, as Michigan holds, judicial in their nature,[11] the due process clause may apply with one effect on the judge's grand jury investigation, but with quite a different effect when the judge-grand jury suddenly makes a witness before it a defendant in a contempt case.

Here we are concerned, not with petitioner's rights as a witness in a secret grand jury session, but with his rights as a defendant in a contempt proceeding. The powers of the judge-grand jury who tried and convicted him in secret and sentenced him to jail on a charge of false and evasive swearing must likewise be measured, not by the limitations applicable to grand jury proceedings, but by the constitutional standards applicable to court proceedings in which an accused may be sentenced to fine or imprisonment or both. Thus our first question is this:

[10] See cases collected in 8 A. L. R. 1579–1580; Orfield, Criminal Procedure from Arrest to Appeal 161 (1947).

[11] *In re Slattery*, 310 Mich. 458, 466–468, 17 N. W. 2d 251, 254–255; *Kloka* v. *State Treasurer*, 318 Mich. 87, 90, 27 N. W. 2d 507, 508; *cf. Todd* v. *United States*, 158 U. S. 278, 284; *Interstate Commerce Commission* v. *Brimson*, 154 U. S. 447, 481, 489; *United States* v. *Ferreira*, 13 How. 40, 44–48.

Can an accused be tried and convicted for contempt of court in grand jury secrecy?

*First.* Counsel have not cited and we have been unable to find a single instance of a criminal trial conducted in camera in any federal,[12] state, or municipal court during the history of this country. Nor have we found any record of even one such secret criminal trial in England since abolition of the Court of Star Chamber in 1641, and whether that court ever convicted people secretly is in dispute. Summary trials for alleged misconduct called contempt of court [13] have not been regarded as an exception to this universal rule against secret trials, unless some other Michigan one-man grand jury case may represent such an exception.

This nation's accepted practice of guaranteeing a public trial to an accused has its roots in our English common law heritage. The exact date of its origin is obscure, but it likely evolved long before the settlement of our land as an accompaniment of the ancient institution of jury trial.[14] In this country the guarantee to an accused of

---

[12] Cases within the jurisdiction of courts martial may be regarded as an exception. *Ex parte Quirin,* 317 U. S. 1, 43; *King* v. *Governor of Lewes Prison,* 61 Sol. J. 294, 30 Harv. L. Rev. 771. Whatever may be the classification of juvenile court proceedings, they are often conducted without admitting all the public. But it has never been the practice wholly to exclude parents, relatives, and friends, or to refuse juveniles the benefit of counsel.

[13] Under Michigan law contempt proceedings against a witness before a one-man grand jury are criminal in nature. *In re Wilkowski,* 270 Mich. 687, 259 N. W. 658. But this characterization is not material in resolving this due process question. *Cf. Gompers* v. *United States,* 233 U. S. 604, 610–611.

[14] Radin, *The Right to a Public Trial,* 6 Temp. L. Q. 381–384. Early commentators mention that public trials were commonly held without attempting to trace their origin. Sir Thomas Smith in 1565 in his De Republica Anglorum bk. 2, pp. 79, 101 (Alston ed. 1906); Sir Matthew Hale about 1670 in his History of The Common Law of

the right to a public trial first appeared in a state constitution in 1776.[15] Following the ratification in 1791 of the Federal Constitution's Sixth Amendment, which commands that "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . ." most of the original states and those subsequently admitted to the Union adopted similar constitutional provisions.[16] Today almost without exception [17] every state by consti-

England 343–345 (Runnington ed. 1820). In 1649, a few years after the Long Parliament abolished the Court of Star Chamber, an accused charged with high treason before a Special Commission of Oyer and Terminer claimed the right to public trial and apparently was given such a trial. Trial of John Lilburne, 4 How. St. Tr. 1270, 1274. "By immemorial usage, wherever the common law prevails, all trials are in open court, to which spectators are admitted." 2 Bishop, New Criminal Procedure § 957 (2d ed. 1913).

[15] Penn. Const., Declaration of Rights IX (1776); N. C. Const., Declaration of Rights IX (1776) (criminal convictions only by jury verdict in "open court").

[16] See, e. g., Vt. Const., ch. I, Declaration of Rights, XI (1787); Del. Const., Art. I, § 7 (1792); Ky. Const., Art. XII, cl. 10 (1792); Tenn. Const., Art. XI, § 9 (1796); Miss. Const., Art. I, § 10 (1817); Mich. Const., Art. I, § 10 (1835); Tex. Const., Art. I, § 8 (1845).

[17] Four states, Massachusetts, New Hampshire, Virginia and Wyoming, appear to have neither statutory nor constitutional provisions specifically requiring that criminal trials be held in public, although all have constitutions guaranteeing an accused the right to a jury trial. Mass. Const., Pt. I, Art. XII; N. H. Const., Pt. First, Arts. 15th, 16th; Va. Const., Art. I, § 8; Wyo. Const., Art. 1, § 10. Massachusetts by implication has recognized that an accused has a right to a public trial as well. A statute of that state permits the exclusion of spectators in only a limited category of cases. Mass. Gen. Laws c. 278, § 16A (1932). In New Hampshire and Wyoming no statute or decision has been found in which the right of an accused to a public trial is mentioned. In Virginia, although no decision has been discovered, a statute provides: "In the trial of all criminal cases, whether the same be felony or misdemeanor cases, the court may, in its discretion, exclude from the trial any or all persons whose presence is not deemed necessary." Va. Code Ann. § 4906 (1942).

tution,[18] statute,[19] or judicial decision,[20] requires that all criminal trials be open to the public.

The traditional Anglo-American distrust for secret trials has been variously ascribed to the notorious use of this practice by the Spanish Inquisition,[21] to the excesses of

---

[18] Forty-one states: Ala. Const., Art. I, § 6; Ariz. Const., Art. II, § 24; Ark. Const., Art. II, § 10; Cal. Const., Art. I, § 13; Colo. Const., Art. II, § 16; Conn. Const., Art. I, § 9; Del. Const., Art. I, § 7; Fla. Const., Declaration of Rights, § 11; Ga. Const., Art. I, § I, par. V; Idaho Const., Art. I, § 13; Ill. Const., Art. II, § 9; Ind. Const., Art. 1, § 13; Iowa Const., Art. I, § 10; Kan. Const., Bill of Rights, § 10; Ky. Const., § 11; La. Const., Art. I, § 9; Me. Const., Art. I, § 6; Mich. Const., Art. II, § 19; Minn. Const., Art. 1, § 6; Miss. Const., Art. 3, § 26; Mo. Const., Art. I, § 18; Mont. Const., Art. III, § 16; Neb. Const., Art. I, § 11; N. J. Const., Art. I, § 8; N. M. Const., Art. II, § 14; N. C. Const., Art. I, § 13 (no convictions for crime except by jury verdict in "open court"); N. D. Const., Art. I, § 13; Ohio Const., Art. I, § 10; Okla. Const., Art. II, § 20; Ore. Const., Art. I, § 11; Pa. Const., Art. I, § 9; R. I. Const., Art. I, § 10; S. C. Const., Art. I, § 18; S. D. Const., Art. 6, § 7; Tenn. Const., Art. I, § 9; Tex. Const., Art. I, § 10; Utah Const., Art. I, § 12; Vt. Const., ch. I, Art. 10th; Wash. Const., Art. I, § 22; W. Va. Const., Art. III, § 14; Wis. Const., Art. I, § 7.

[19] Two states: Nev. Comp. Laws Ann. § 10654 (1929); N. Y. Civil Rights Law § 12.

[20] The Maryland Court of Appeals has apparently interpreted the state constitution as prohibiting secret trials. *Dutton* v. *State*, 123 Md. 373, 386–388, 91 A. 417, 422–423.

[21] Radin, *The Right to a Public Trial*, 6 Temp. L. Q. 381, 389. The criminal procedure of the civil law countries long resembled that of the Inquisition in that the preliminary examination of the accused, the questioning of witnesses, and the trial of the accused were conducted in secret. Esmein, A History of Continental Criminal Procedure 183–382 (1913); Ploscowe, *Development of Inquisitorial and Accusatorial Elements in French Procedure*, 23 J. Crim. L. & Criminology 372–386. The ecclesiastical courts of Great Britain, which intermittently exercised a limited civil and criminal jurisdiction, adopted a procedure described as "in name as well as in fact an Inquisition, differing from the Spanish Inquisition in the circumstances that it did not at any time as far as we are aware employ torture, and that the bulk of the business of the courts was of a comparatively

the English Court of Star Chamber,[22] and to the French monarchy's abuse of the *lettre de cachet*.[23] All of these institutions obviously symbolized a menace to liberty. In

unimportant kind . . . ." 2 Stephen, History of the Criminal Law of England, 402 (1883). The secrecy of the ecclesiastical courts and the civil law courts was often pointed out by commentators who praised the publicity of the common law courts. See *e. g.*, 3 Blackstone, Commentaries *373; 1 Bentham, Rationale of Judicial Evidence, 594–595, 603 (1827). The English common law courts which succeeded to the jurisdiction of the ecclesiastical courts have renounced all claim to hold secret sessions in cases formerly within the ecclesiastical jurisdiction, even in civil suits. See, *e. g.*, *Scott* v. *Scott*, [1913] A. C. 417.

[22] *Davis* v. *United States*, 247 F. 394, 395; *Keddington* v. *State*, 19 Ariz. 457, 459, 172 P. 273; *Williamson* v. *Lacy*, 86 Me. 80, 82–83, 29 A. 943, 944; *Dutton* v. *State*, 123 Md. 373, 387, 91 A. 417, 422; Jenks, The Book of English Law 91 (3d ed. 1932). Some authorities have said that trials in the Star Chamber were public, but that witnesses against the accused were examined privately with no opportunity for him to discredit them. Apparently all authorities agree that the accused himself was grilled in secret, often tortured, in an effort to obtain a confession and that the most objectionable of the Star Chamber's practices was its asserted prerogative to disregard the common law rules of criminal procedure when the occasion demanded. 5 Holdsworth, A History of English Law, 163, 165, 180–197 (2d ed. 1937); Radin, *The Right to a Public Trial*, 6 Temp. L. Q. 381, 386–388; Washburn, *The Court of Star Chamber*, 12 Am. L. Rev. 21, 25–31.

[23] Radin, *The Right to a Public Trial*, 6 Temp. L. Q. 381, 388. The *lettre de cachet* was an order of the king that one of his subjects be forthwith imprisoned or exiled without a trial or an opportunity to defend himself. In the eighteenth century they were often issued in blank to local police. Louis XV is supposed to have issued more than 150,000 *lettres de cachet* during his reign. This device was the principal means employed to prosecute crimes of opinion, although it was also used by the royalty as a convenient method of preventing the public airing of intra-family scandals. Voltaire, Mirabeau and Montesquieu, among others, denounced the use of the *lettre de cachet*, and it was abolished after the French Revolution, though later temporarily revived by Napoleon. 13 Encyc. Brit. 971; 3 Encyc. Soc. Sci. 137.

the hands of despotic groups each of them had become an instrument for the suppression of political and religious heresies in ruthless disregard of the right of an accused to a fair trial. Whatever other benefits the guarantee to an accused that his trial be conducted in public may confer upon our society,[24] the guarantee has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution. The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.[25] One need not wholly agree with a statement made on the subject by

---

[24] Other benefits attributed to publicity have been: (1) Public trials come to the attention of key witnesses unknown to the parties. These witnesses may then voluntarily come forward and give important testimony. 6 Wigmore, Evidence § 1834 (3d ed. 1940); *Tanksley* v. *United States*, 145 F. 2d 58, 59.

(2) The spectators learn about their government and acquire confidence in their judicial remedies. 6 Wigmore, Evidence § 1834 (3d ed. 1940); 1 Bentham, Rationale of Judicial Evidence 525 (1827); *State* v. *Keeler*, 52 Mont. 205, 156 P. 1080; 20 Harv. L. Rev. 489.

[25] Jenks, The Book of English Law 91 (1932); Auld, *Comparative Jurisprudence of Criminal Process*, 1 U. of Toronto L. J. 82, 99; Radin, *The Right to a Public Trial*, 6 Temp. L. Q. 381; *Criminal Procedure in Scotland and England*, 108 Edinburgh Rev. 174, 181–182; Holmes, J. in *Cowley* v. *Pulsifer*, 137 Mass. 392, 394; *State* v. *Osborne*, 54 Ore. 289, 295–297, 103 P. 62, 64–66. *People* v. *Murray*, 89 Mich. 276, 286, 50 N. W. 995, 998: "It is for the protection of all persons accused of crime—the innocently accused, that they may not become the victim of an unjust prosecution, as well as the guilty, that they may be awarded a fair trial—that one rule [as to public trials] must be observed and applied to all." Frequently quoted is the statement in 1 Cooley, Constitutional Limitations (8th ed. 1927) at 647: "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions . . . ."

Jeremy Bentham over 120 years ago to appreciate the fear of secret trials felt by him, his predecessors and contemporaries. Bentham said: ". . . suppose the proceedings to be completely secret, and the court, on the occasion, to consist of no more than a single judge,—that judge will be at once indolent and arbitrary: how corrupt soever his inclination may be, it will find no check, at any rate no tolerably efficient check, to oppose it. Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account. Recordation, appeal, whatever other institutions might present themselves in the character of checks, would be found to operate rather as cloaks than checks; as cloaks in reality, as checks only in appearance." [26]

In giving content to the constitutional and statutory commands that an accused be given a public trial, the state and federal courts have differed over what groups of spectators, if any, could properly be excluded from a criminal trial.[27] But, unless in Michigan and in one-man grand jury contempt cases, no court in this country has ever before held, so far as we can find, that an accused can be tried, convicted, and sent to jail, when everybody else is denied entrance to the court, except the judge and his attaches.[28] And without exception all courts have held

---

[26] 1 Bentham, Rationale of Judicial Evidence 524 (1827).

[27] Compare *People* v. *Murray*, 89 Mich. 276, 50 N. W. 995; and *People* v. *Yeager*, 113 Mich. 228, 71 N. W. 491, with *Reagan* v. *United States*, 202 F. 488. For collection and analysis of the cases, see 6 Wigmore, Evidence § 1834 (3d ed. 1940); Orfield, Criminal Procedure from Arrest to Appeal 385–387 (1947); Radin, *The Right to a Public Trial*, 6 Temp. L. Q. 381, 389–391; Note, 35 Mich. L. Rev. 474; 8 U. of Det. L. J. 129; 156 A. L. R. 265.

[28] "For the purposes contemplated by the provision of the constitution, the presence of the officers of the court, men whom [*sic*], it is safe to say, were under the influence of the court, made the trial no more public than if they too had been excluded." *People* v. *Hartman*, 103 Cal. 242, 244, 37 P. 153, 154.

that an accused is at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged.[29]  In *Gaines* v. *Washington,* 277 U. S. 81, 85–86, this Court assumed that a criminal trial conducted in secret would violate the procedural requirements of the Fourteenth Amendment's due process clause, although its actual holding there was that no violation had in fact occurred, since the trial court's order barring the general public had not been enforced.  Certain proceedings in a judge's chambers, including convictions for contempt of court, have occasionally been countenanced by state courts,[30] but there has never been any intimation that all of the public, including the accused's relatives, friends, and counsel, were barred from the trial chamber.

In the case before us, the petitioner was called as a witness to testify in secret before a one-man grand jury conducting a grand jury investigation.  In the midst of petitioner's testimony the proceedings abruptly changed. The investigation became a "trial," the grand jury became a judge, and the witness became an accused charged with contempt of court—all in secret.  Following a charge, conviction and sentence, the petitioner was led away to

---

[29] See, *e. g.*, *State* v. *Beckstead,* 96 Utah 528, 88 P. 2d 461 (error to exclude friends and relatives of accused) ; *Benedict* v. *People,* 23 Colo. 126, 46 P. 637 (exclusion of all except witnesses, members of bar and law students upheld) ; *People* v. *Hall,* 51 App. Div. 57, 64 N. Y. S. 433 (exclusion of general public upheld where accused permitted to designate friends who remained).  "No court has gone so far as affirmatively to exclude the press."  Note, 35 Mich. L. Rev. 474, 476.  Even those who deplore the sensationalism of criminal trials and advocate the exclusion of the general public from the courtroom would preserve the rights of the accused by requiring the admission of the press, friends of the accused, and selected members of the community.  Radin, *The Right to a Public Trial,* 6 Temp. L. Q. 381, 394–395; 20 J. Am. Jud. Soc. 83.

[30] Cases are collected in 27 Ann. Cas. 35.

prison—still without any break in the secrecy. Even in jail, according to undenied allegations, his lawyer was denied an opportunity to see and confer with him. And that was not the end of secrecy. His lawyer filed in the State Supreme Court this habeas corpus proceeding. Even there, the mantle of secrecy enveloped the transaction and the State Supreme Court ordered him sent back to jail without ever having seen a record of his testimony, and without knowing all that took place in the secrecy of the judge's chambers. In view of this nation's historic distrust of secret proceedings, their inherent dangers to freedom, and the universal requirement of our federal and state governments that criminal trials be public, the Fourteenth Amendment's guarantee that no one shall be deprived of his liberty without due process of law means at least that an accused cannot be thus sentenced to prison.

*Second.* We further hold that failure to afford the petitioner a reasonable opportunity to defend himself against the charge of false and evasive swearing was a denial of due process of law. A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense—a right to his day in court—are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel.[31] Michigan, not denying the existence of these rights in criminal cases generally, apparently concedes that the summary conviction here would have been a denial of procedural due process but for the nature of the charge,

---

[31] The following decisions of this Court involving various kinds of proceedings are among the multitude that support the above statement: *Snyder* v. *Massachusetts*, 291 U. S. 97, 116; *Powell* v. *Alabama*, 287 U. S. 45, 68–70; *Hovey* v. *Elliott*, 167 U. S. 409, 418; *Holden* v. *Hardy*, 169 U. S. 366, 390–391; *Morgan* v. *United States*, 304 U. S. 1, 14–15, and cases there cited.

namely, a contempt of court, committed, the State urges, in the court's actual presence.

It is true that courts have long exercised a power summarily to punish certain conduct committed in open court without notice, testimony or hearing. *Ex parte Terry,* 128 U. S. 289, was such a case. There Terry committed assault on the marshal who was at the moment removing a heckler from the courtroom. The "violence and misconduct" of both the heckler and the marshal's assailant occurred within the "personal view" of the judge, "under his own eye," and actually interrupted the trial of a cause then under way. This Court held that under such circumstances a judge has power to punish an offender at once, without notice and without hearing, although his conduct may also be punishable as a criminal offense. This Court reached its conclusion because it believed that a court's business could not be conducted unless it could suppress disturbances within the courtroom by immediate punishment. However, this Court recognized that such departure from the accepted standards of due process was capable of grave abuses, and for that reason gave no encouragement to its expansion beyond the suppression and punishment of the court-disrupting misconduct which alone justified its exercise. Indeed in the *Terry* case the Court cited with approval its decision in *Anderson* v. *Dunn,* 6 Wheat. 204, which had marked the limits of contempt authority in general as being "the least possible power adequate to the end proposed." *Id.* at 231. And see *In re Michael,* 326 U. S. 224, 227.

That the holding in the *Terry* case is not to be considered as an unlimited abandonment of the basic due process procedural safeguards, even in contempt cases, was spelled out with emphatic language in *Cooke* v. *United States,* 267 U. S. 517, a contempt case arising in a federal district court. There it was pointed out that for a

court to exercise the extraordinary but narrowly limited power to punish for contempt without adequate notice and opportunity to be heard, the court-disturbing misconduct must not only occur in the court's immediate presence, but that the judge must have personal knowledge of it acquired by his own observation of the contemptuous conduct. This Court said that knowledge acquired from the testimony of others, or even from the confession of the accused, would not justify conviction without a trial in which there was an opportunity for defense. Furthermore, the Court explained the *Terry* rule as reaching only such conduct as created "an open threat to the orderly procedure of the court and such a flagrant defiance of the person and presence of the judge before the public" that, if "not instantly suppressed and punished, demoralization of the court's authority will follow." *Id.* at 536.

Except for a narrowly limited category of contempts, due process of law as explained in the *Cooke* case requires that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf, either by way of defense or explanation. The narrow exception to these due process requirements includes only charges of misconduct, in open court, in the presence of the judge, which disturbs the court's business, where all of the essential elements of the misconduct are under the eye of the court, are actually observed by the court, and where immediate punishment is essential to prevent "demoralization of the court's authority" before the public. If some essential elements of the offense are not personally observed by the judge, so that he must depend upon statements made by others for his knowledge about these essential elements, due process requires, according to the

*Cooke* case, that the accused be accorded notice and a fair hearing as above set out.

The facts shown by this record put this case outside the narrow category of cases that can be punished as contempt without notice, hearing and counsel. Since the petitioner's alleged misconduct all occurred in secret, there could be no possibility of a demoralization of the court's authority before the public. Furthermore, the answer of the judge-grand jury to the petition for habeas corpus showed that his conclusion that the petitioner had testified falsely was based, at least in part, upon the testimony given before him by one or more witnesses other than petitioner. Petitioner and one Hartley both testified the same day; both were pin-ball machine operators; both had bought or had in their possession certain so-called bonds purchased from one Mitchell; both were sent to jail for contempt the same day. *In re Hartley,* 317 Mich. 441, 27 N. W. 2d 48. The judge-grand jury pressed both petitioner and Hartley to state why they bought bonds which were patently worthless. The petitioner was also repeatedly asked what he had done with the worthless bonds. He answered every question asked him, according to the fragmentary portions of his testimony reported to the Michigan Supreme Court, most of which is included in that court's opinion. He steadfastly denied that he knew precisely what he had done with the worthless bonds, but made several different statements as to how he might have disposed of them, such as that he might have thrown them into the wastebasket, or trash can, or might have burned them.

In upholding the judge-grand jury's conclusion that petitioner had testified falsely and evasively, the majority of the Michigan Supreme Court gave as one reason a statement in the judge-grand jury's answer "That the Grand Jury, after investigation, is satisfied that the bonds

sold by the said Carman A. Mitchell to the said William D. Oliver are the same as those sold by the said Carman A. Mitchell to Leo Thomas Hartley." Nothing in the petitioner's testimony as reported could have remotely justified the judge-jury in drawing such a conclusion. The judge-jury was obviously appraising the truth of Oliver's testimony in light of testimony given the same day in petitioner's absence by Hartley and possibly by other witnesses. The *Terry* case and others like it provide no support for sustaining petitioner's conviction of contempt of court upon testimony given in petitioner's absence. This case would be like the *Terry* case only if the judge there had not personally witnessed Terry's assault upon the marshal but had nevertheless sent him to jail for contempt of court after hearing the testimony of witnesses against Terry in Terry's absence. It may be conceivable, as is here urged, that a judge can under some circumstances correctly detect falsity and evasiveness from simply listening to a witness testify. But this is plainly not a case in which the finding of falsity rested on an exercise of this alleged power. For this reason we need not pass on the question argued in the briefs whether a judge can, consistently with procedural due process, convict a witness of testifying falsely and evasively solely on the judge's ability to detect it from merely observing a witness and hearing him testify.

Nor is there any reason suggested why "demoralization of the court's authority" would have resulted from giving the petitioner a reasonable opportunity to appear and offer a defense in open court to a charge of perjury or to the charge of contempt. The traditional grand juries have never punished contempts.[32] The practice that has always been followed with recalcitrant grand jury wit-

---

[32] See note 10 *supra*.

nesses is to take them into open court, and that practice, consistent with due process, has not demoralized the authority of courts. Reported cases reveal no instances in which witnesses believed by grand juries on the basis of other testimony to be perjurers have been convicted for contempt, or for perjury, without notice of the specific charges against them, and opportunity to prepare a defense, to obtain counsel, to cross-examine the witnesses against them and to offer evidence in their own defense. The right to be heard in open court before one is condemned is too valuable to be whittled away under the guise of "demoralization of the court's authority."

It is "the law of the land" that no man's life, liberty or property be forfeited as a punishment until there has been a charge fairly made and fairly tried in a public tribunal. See *Chambers* v. *Florida,* 309 U. S. 227, 236–237. The petitioner was convicted without that kind of trial.

The judgment of the Supreme Court of Michigan is reversed and the cause is remanded to it for disposition not inconsistent with this opinion.

*Reversed and remanded.*

Mr. Justice Rutledge, concurring.

I join in the Court's opinion and decision. But there is more which needs to be said.

Michigan's one-man grand jury, as exemplified by this record, combines in a single official the historically separate powers of grand jury, committing magistrate, prosecutor, trial judge and petit jury. This aggregated authority denies to the accused not only the right to a public trial, but also those other basic protections secured by the Sixth Amendment, namely, the rights "to be informed

of the nature and cause of the accusation; [1] to be confronted with the witnesses against him; [2] to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence." It takes away the security against being twice put in jeopardy for the same offense [3] and denies the equal protection of the laws by leaving to the committing functionary's sole discretion the scope and contents of the record on appeal. [4] U. S. Const. Amend. V and XIV.

This aggregation of powers and inherently concomitant denial of historic freedoms were unknown to the common law at the time our institutions crystallized in the Constitution. They are altogether at variance with our tradition and system of government. They cannot stand the test of constitutionality for purposes of depriving any person of life, liberty or property. There is no semblance of due process of law in the scheme when it is used for those ends. [5]

[1] The requirement, of course, contemplates that the accused be so informed sufficiently in advance of trial or sentence to enable him to determine the nature of the plea to be entered and to prepare his defense if one is to be made. Cf. *White* v. *Ragen,* 324 U. S. 760, 764; *Powell* v. *Alabama,* 287 U. S. 45.

[2] The only "witness" in this case was the grand jury-judge who, so far as the record discloses, did not submit to cross-examination.

[3] As the Court's opinion notes, the state supreme court has held that the witness may be reexamined and recommitted for a further 60-day period after serving the first sentence of that length, unless he reappears and answers the same questions to the satisfaction of the one-man grand jury. *In re Ward,* 295 Mich. 742, 747.

[4] Cf. *Cochran* v. *Kansas,* 316 U. S. 255. So far as appears, only persons committed or fined by a one-man grand jury are subjected in Michigan to this attenuated appellate procedure. Others convicted of crime, including criminal contempt, apparently are afforded rights to complete and nondiscretionary records on appeal.

[5] The immediate shift of the proceeding from inquisitorial to punitive function converts it from a grand jury investigation to a proceeding in criminal contempt.

The case demonstrates how far this Court departed from our constitutional plan when, after the Fourteenth Amendment's adoption, it permitted selective departure by the states from the scheme of ordered personal liberty established by the Bill of Rights.[6]   In the guise of permitting the states to experiment with improving the administration of justice, the Court left them free to substitute, "in spite of the absolutism of continental governments," their "ideas and processes of civil justice" in place of the time-tried "principles and institutions of the common law"[7] perpetuated for us in the Bill of Rights. Only by an exercise of this freedom has Michigan been enabled to adopt and apply her scheme as was done in this case.   It is the immediate offspring of *Hurtado* v. *California,* 110 U. S. 516, and later like cases.[8]

So long as they stand, so long as the Bill of Rights is regarded here as a strait jacket of Eighteenth Century procedures rather than a basic charter of personal liberty, like experimentations may be expected from the states. And the only check against their effectiveness will be the agreement of a majority of this Court that the experiment violates fundamental notions of justice in civilized society.

I do not conceive that the Bill of Rights, apart from the due process clause of the Fifth Amendment, incorporates all such ideas.   But as far as its provisions go, I know of no better substitutes.   A few may be inconvenient.   But restrictions upon authority for securing personal liberty, as well as fairness in trial to deprive

---

[6] Cf. *Adamson* v. *California,* 332 U. S. 46, dissenting opinion of MR. JUSTICE BLACK at 68.

[7] See *Hurtado* v. *California,* 110 U. S. 516, 531.

[8] *E. g., Twining* v. *New Jersey,* 211 U. S. 78; *Adamson* v. *California,* 332 U. S. 46.

one of it, are always inconvenient—to the authority so restricted. And in times like these I do not think substitutions imported from other systems, including continental ones, offer promise on the whole of more improvement than harm, either for the cause of perfecting the administration of justice or for that of securing and perpetuating individual freedom, which is the main end of our society as it is of our Constitution.

One cannot attribute the collapse of liberty in Europe and elsewhere during recent years solely to the "ideas and processes of civil justice" prevailing in the nations which have suffered that loss. Neither can one deny the significance of the contrast between their success in maintaining systems of ordered liberty and that of other nations which in the main have adhered more closely to the scheme of personal freedoms the Bill of Rights secures. This experience demonstrates, I think, that it is both wiser and safer to put up with whatever inconveniences that charter creates than to run the risk of losing its hard-won guaranties by dubious, if also more convenient, substitutions imported from alien traditions.[9]

---

[9] I do not think it can be demonstrated that state systems, freed of the Bill of Rights' "inconveniences," have been more fair, just, or efficient than the federal system of administering criminal justice, which has never been clear of their restraints.

Notwithstanding *Betts* v. *Brady*, 316 U. S. 455, and its progeny, I cannot imagine that state denial of the right to counsel beyond that permissible in the federal courts or indeed of any other guaranty of the Sixth Amendment could bring an improvement in the administration of justice.

The guaranties seemingly considered most obstructive to that process are those of the Fifth Amendment requiring presentment or indictment of a grand jury and securing the privilege against self-incrimination; the rights to jury trial and to the assistance of counsel secured by the Sixth Amendment; and the requirements relating to suits at common law of the Seventh Amendment. Whatever inconveniences these or any of them may be thought to involve are far out-

The states have survived with the nation through great vicissitudes, for the greater part of our history, without wide departures or numerous ones from the plan of the Bill of Rights. They accepted that plan for the nation when they ratified those amendments. They accepted it for themselves, in my opinion, when they ratified the Fourteenth Amendment. *Adamson* v. *California,* 332 U. S. 46, dissenting opinions, at 68, 123. It was good enough for our fathers. I think it should be good enough for this Court and for the states.

Room enough there is beyond the specific limitations of the Bill of Rights for the states to experiment toward improving the administration of justice. Within those limitations there should be no laboratory excursions, unless or until the people have authorized them by the constitutionally provided method. This is no time to experiment with established liberties. That process carries the dangers of dilution and denial with the chances of enforcing and strengthening.

It remains only to say that, in the face of so broad a departure from so many specific constitutional guaranties or, if the other view is to control, from their aggregate summarized in the concept of due process as representing fundamental ideas of fair play and justice in civilized society, such as the record in this case presents, this Court's eyes need not remain closed nor its hand idle until the case is returned to the state supreme court for reaffirmation of its position or confirmation of our views expressed in the Court's opinion. Neither *Rescue Army* v. *Municipal Court,* 331 U. S. 549, nor *Musser* v. *Utah,* 333 U. S. 95, presented a situation like the one tendered here, whether

weighed by the aggregate of security to the individual afforded by the Bill of Rights. That aggregate cannot be secured, indeed it may be largely defeated, so long as the states are left free to make broadly selective application of its protections.

in relation to the disentanglement of constitutional issues from questions of state law or, consequently, in respect to the breadth and clarity of the state's departure from federal constitutional commands. Neither case therefore requires or justifies the disposition of this cause according to the procedure there followed. This case is neither unripe for decision nor wanting of sufficient basis in the record for exercise of that function.

MR. JUSTICE FRANKFURTER.

Under the Fourteenth Amendment, a State may surely adopt as its own a procedure which was the established method for prosecuting crime in nearly half the States which ratified that amendment. And so, it may abolish the grand jury,[1] or it may reduce the size of the grand

---

[1] In sustaining this power of the States, the Court enunciated a principle the force of which has not lessened with time: "The Constitution of the United States was ordained, it is true, by descendants of Englishmen, who inherited the traditions of English law and history; but it was made for an undefined and expanding future, and for a people gathered and to be gathered from many nations and of many tongues. And while we take just pride in the principles and institutions of the common law, we are not to forget that in lands where other systems of jurisprudence prevail, the ideas and processes of civil justice are also not unknown. Due process of law, in spite of the absolutism of continental governments, is not alien to that code which survived the Roman Empire as the foundation of modern civilization in Europe, and which has given us that fundamental maxim of distributive justice—*suum cuique tribuere*. There is nothing in Magna Charta, rightly construed as a broad charter of public right and law, which ought to exclude the best ideas of all systems and of every age; and as it was the characteristic principle of the common law to draw its inspiration from every fountain of justice, we are not to assume that the sources of its supply have been exhausted. On the contrary, we should expect that the new and various experiences of our own situation and system will mould and shape it into new and not less useful forms." *Hurtado* v. *California*, 110 U. S. 516, 530–31.

jury, and even to a single member. A State has great leeway in devising its judicial instruments for probing into conduct as a basis for charging the commission of crime. It may, at the same time, surround such preliminary inquiry with safeguards, not only that crime may be detected and criminals punished, but also that charges may be sifted in secret so as not to injure or embarrass the innocent.

Flouting of such a judicial investigatory system may be prevented by the hitherto constitutionally valid power to punish for contempt. There must, however, be such recalcitrance, where the basis of punishment is testimony given or withheld, that the administration of justice is actively blocked. See *Ex parte Hudgings,* 249 U. S. 378. And the procedural safeguards of "due process" must be observed. Due notice of the charge and a fair opportunity to meet it, are indispensable. This involves an opportunity to canvass the charge in the open and not behind closed doors. So long as a man has ample opportunity to demonstrate his innocence before he is hustled off to jail, he cannot complain that a State has seen fit to devise a new procedure for satisfying that opportunity. Just as it is not violative of due process for a State to take private property for public use and leave to a later stage the constitutional vindication of the right to compensation, it does not seem to me that it would be violative of due process to allow the judge-grand juror of Michigan to find criminal contempt for conduct in his proceedings without the familiar elements of an open trial, provided that the State furnishes the accused a public tribunal before which he has full opportunity to be quit of the finding.

But an opportunity to meet a charge of criminal contempt must be a fair opportunity. It would not be fair, if in the court in which the accused can contest for the first time the validity of the charge against him, he comes

handicapped with a finding against him which he did not have an adequate opportunity of resisting.

We are here dealing with the attempt of a State having the seventh largest population in the Union to curb or mitigate the commission of crimes by effective prosecution. This procedure has been in operation for over thirty years. It was not heedlessly entered into nor has it been sporadically pursued. In a series of cases it has had the sanction of the highest court of Michigan. While there are indications in the opinion of the Supreme Court of Michigan from which we could infer the constitutional inadequacy of the procedure pursued in this case, we should not decide constitutional issues and conclude that the Michigan system offends the Constitution of the United States, without a clearer formulation of what it is that actually happens under this system, or did happen here, than the case before us reveals.

It is to me significant that the precise issues on which this Court decides this case have never been explicitly challenged before, or passed on, by the Supreme Court of Michigan in the series of cases in which that court had adjudicated controversies arising under the Michigan grand jury system. If a State has denied the due process required by the Fourteenth Amendment, it is more consonant with the delicate relations between the United States and the courts of the United States, and the States and the courts of the States, that the courts of the States be given the fullest opportunity, by proper presentation of the issues, to make such a finding of unconstitutionality.

I do not think that we have had that in this case. For instance, while I could regard it inadmissible under the Fourteenth Amendment to have only a partial and mutilated record of the proceedings before the grand juror-judge when the contemnor for the first time has the opportunity to meet the accusation against him publicly, the petitioner himself in this case seems to repel the

suggestion that that is his complaint.[2]   Certainly, as MR.
JUSTICE JACKSON points out, the first ground of the Court's
opinion was not made the basis for inviting our review
here.   I agree with him in concluding that in the light
of our decision the other day in *Musser* v. *Utah,* 333 U. S.
95, in conjunction with *Rescue Army* v. *Municipal Court,*
331 U. S. 549, the cause should be returned to the Supreme
Court of Michigan to enable that court to pass upon these
issues.

MR. JUSTICE JACKSON, with whom MR. JUSTICE FRANK-
FURTER agrees, dissenting.

The principal ground assigned for reversal of the judg-
ment of conviction is the alleged secrecy of the contempt
procedure.   That ground was not assigned for review in
the petition for certiorari to this Court.   Nor was it
raised in the petition for writ of *habeas corpus* in the
state courts.   Therefore, it has not been litigated and
the record has not been made with reference to it.   On
the other hand, the principal question raised by the peti-
tion to this Court and argued by the State is not decided
by the Court's opinion.

When a case here from a state court involves a question
not litigated below, not raised by petitioner here and
which the state court has had no opportunity to pass
upon, we should remand the case for its further considera-
tion, as was just done in *Musser* v. *Utah,* 333 U. S. 95.

_____

[2] "Neither in our brief nor in our argument before the court have
we urged this court to reverse this conviction merely because the
partial return of the witness's testimony to the Supreme Court con-
stituted a denial of due process. . . .   The questions we present are
much more basic,—the denial of due process in the original commit-
ment. . . .   [To] us it is much more shocking that an accused
charged with contempt not committed in open court be denied *any*
trial in the lower court than that he be given a trial only upon an
incomplete record in the appellate court."   Petitioner's "Brief in
Answer to Brief of State Bar of Michigan," pp. 13–14.