Harriet NESTEL et al.

v.

John MORAN, Director Department of
Corrections, State of Rhode Island.

No. 85–481–M.P.

Supreme Court of Rhode Island.

July 31, 1986.

Amy Tabor, Pawtucket, for plaintiffs.

Arlene Violet, Atty. Gen., Timothy J. Conlon, Sp. Asst. Atty. Gen., for defendant.

## OPINION

WEISBERGER, Justice.

These are petitions for the issuance of writs of habeas corpus filed by five persons incarcerated on convictions of criminal contempt.

On October 18, 1985, five individuals were sentenced at the Providence County Courthouse in a case entitled *State v. Boston et al.*, W-2, 84–356, for convictions of malicious destruction of property arising out of antinuclear protests at the General Dynamics Trident Submarine Facility at

Quonset, Rhode Island. The five petitioners,[1] friends of the *Boston* defendants, were spectators at the sentencing proceeding. After the trial justice pronounced sentence upon the final *Boston* defendant, petitioners, who were seated in the back of the courtroom, stood and turned their backs to the court.

The trial justice described the event and instructed the sheriff as follows:

"[W]ould you remove those people who have turned their backs to this Court and hold them in the corridor for further proceedings before me. Take each of them out who have stood and turned their back [*sic* ] to this Court in the presence of the television camera. Take them immediately from the courtroom, and return them to me after the courtroom has been cleared and I will impose whatever I am required to impose.

"Madam Clerk, the proceedings have been disrupted by those rude individuals who have been taken from the Court and who will be dealt with shortly, you may now proceed to read the sentence imposed on each defendant as required by law."

After the sentences of the *Boston* defendants had been read, the court recessed. Approximately an hour later petitioners were brought back into the courtroom, one by one. The trial justice repeated, in essence, the following statement to each petitioner, incorporating his perception of the facts:

"As a result of [your] conduct, I ordered you to be seated. You remained standing. I then ordered the marshals to remove you from the courtroom. I ordered the marshals to escort each of those who were standing with their back to the Court from the courtroom. That process took some few minutes during which time this Court and the many people who were in this Court were exposed to an extremely volatile situation. I both heard and I saw your disrespectful conduct committed in the presence of the Court. That conduct which openly challenged the authority of this Court and which interrupted the sentencing proceedings which I was engaged in at the time, and which impaired the Court's prestige and authority and the public interest in the prompt dignified and lawful administration of justice requires some reaction on my part in accordance with Rule 42 of the Rules of Criminal Procedure. I find that conduct to be wilful, direct contempt of authority and dignity of this Court."

The trial justice summarily sentenced each petitioner to ten days at the Adult Correctional Institutions for contempt pursuant to Rule 42(a) of the Superior Court Rules of Criminal Procedure.[2]

On October 21, 1985, petitioners filed petitions for writs of habeas corpus and the following day moved for release on bail pending consideration of their petitions. On October 24 petitioners were each released on $50 cash bail.[3]

Rule 42(a) and its federal counterpart have been consistently interpreted to per-

---

1. Harriet Nestel, Vincent Kay, Elizabeth Davidson, George W. Thompson, Jr., and Susan Komisaruk.

2. Rule 42(a) of the Superior Court Rules of Criminal Procedure provides:

"Summary Disposition. A criminal contempt may be punished summarily if the justice certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the adjudication and sentence and shall be signed by the justice and entered of record."

3. The case was heard on March 7, 1986. One week later, the five petitions for writs of habeas corpus were denied by an equally divided court. On March 27, 1986, petitioners' petition for reargument before the full court, filed pursuant to Rule 25(a) of the Supreme Court Rules, was granted as was petitioners' motion to stay the order directing them to serve the remainder of their sentences. Despite petitioners' belief that an appeal had been filed, there is no record of it; therefore, we shall treat the petitions for habeas corpus as an appeal from the conviction for criminal contempt. *See State v. Costantino,* 107 R.I. 215, 266 A.2d 33 (1970).

mit a court to dispense with due process requirements and exercise its extraordinary but narrowly limited power to punish summarily for contempt only in specifically delineated circumstances: when the alleged misconduct has occurred "in open court, in the presence of the judge, which disturbs the court's business, where all of the essential elements of the misconduct are under the eye of the court, are actually observed by the court, and where immediate punishment is essential to prevent 'demoralization of the court's authority' before the public." *In re Oliver*, 333 U.S. 257, 275, 68 S.Ct. 499, 509, 92 L.Ed. 682, 695 (1948). *See also State v. Champa*, 494 A.2d 102, 106 (R.I. 1985).

■ No principle of freedom of speech supports the concept that demonstrations, even with a speech or communicative component, may be allowed within the framework of a judicial proceeding or so close to it as to influence the participants in such proceeding. In *Cox v. Louisiana*, 379 U.S. 559, 565, 85 S.Ct. 476, 481, 13 L.Ed.2d 487, 492–93 (1965), Justice Goldberg, writing for the majority, commenting about the right of a state to forbid picketing and demonstrations in or near a courthouse, made the following observations:

"It is, of course, true that most judges will be influenced only by what they see and hear in court. However, judges are human; and the legislature has the right to recognize the danger that some judges, jurors, and other court officials, will be consciously or unconsciously influenced by demonstrations in or near their courtrooms both prior to and at the time of the trial. A State may also properly protect the judicial process from being misjudged in the minds of the public. Suppose demonstrators paraded and picketed * * * asking that indictments be dismissed, and that a judge, completely uninfluenced by these demonstrations, dismissed the indictments. A State may protect against the possibility of a conclusion by the public under these circumstances that the judge's action was in part a product of intimidation and did not flow only from the fair and orderly working of the judicial process."

In that same case Justice Black, concurring in part and dissenting in part, made the following comments about picketing or demonstrations in or near a courthouse:

"Justice cannot be rightly administered, nor are the lives and safety of prisoners secure, where throngs of people clamor against the processes of justice right outside the courthouse or jailhouse doors. The streets are not now and never have been the proper place to administer justice. Use of the streets for such purposes has always proved disastrous to individual liberty in the long run, whatever fleeting benefits may have appeared to have been achieved." 379 U.S. at 583, 85 S.Ct. at 471, 13 L.Ed.2d at 503.

These words of the robust defender of free speech could be applied even more strongly to demonstrations or picketing within the courtroom itself. This is the type of conduct that was referred to in *In re Oliver*, 333 U.S. at 274–76, 68 S.Ct. at 508–09, 92 L.Ed. at 694–95, when the Court recognized that a judge has the power to punish an offender who interrupts a court proceeding within the personal view of the judge. The United States Supreme Court noted that such punishment might be imposed without notice and without hearing because it believed that a court's business could not be conducted unless it could suppress disturbances within the courtroom by immediate punishment. *Id.* at 274, 68 S.Ct. at 508, 92 L.Ed. at 694.

■ In the case at bar, petitioners chose by pre-arrangement to stand in protest and turn their backs to the judge in order to demonstrate their disapproval of a sentence or group of sentences imposed upon persons convicted of a criminal offense. This demonstration obviously interrupted the court proceedings since the record shows that the judge postponed the reading by the clerk of the sentences until after petitioners had been removed from the courtroom.

The record indicates that the judge, in imposing punishment on petitioners, was laboring under a misconception of fact, namely, that he had ordered petitioners to be seated, before removing them from the courtroom. It is clear that the record demonstrates that the judge was mistaken about the order to be seated. This mistake does not vitiate the validity of his holding that the initial demonstration constituted a contumacious act. At most the trial justice's mistake concerning the order to be seated would tend to palliate the offense but not to excuse it. The petitioners were not entitled to any admonition or order to be seated. They chose to demonstrate, albeit silently, in the courtroom.

This act interrupted the court proceedings, diverted the trial justice's attention from the business at hand, and caused him to enlist the aid of security personnel to remove petitioners. The fact that the trial justice was led into a mistake of fact concerning an order to petitioners to be seated only illustrates the effect that the demonstration had upon his perceptive powers. The demonstration not only interrupted the court proceedings but also created sufficient distraction so that the trial justice erred in his recollection of what he had said in the midst of this diversionary action.

█ We conclude that it is essential that this court firmly and steadfastly uphold the right of a trial justice to impose summary punishment in these circumstances. It may be argued that the trial justice might have imposed a different sentence if his recollection had been totally accurate. Undoubtedly he felt that the offense was exacerbated because he believed the petitioners had violated a direct order to be seated. Taking this into account and being mindful that appellate courts have taken the position that they may modify sentences imposed for contempt on appeal, *Green v. United States*, 356 U.S. 165, 188, 78 S.Ct. 632, 645, 2 L.Ed.2d 672, 690 (1958), we have decided to exercise that power in the instant case. Rather than remand the case to the trial justice for reconsideration in light of twenty-twenty hindsight furnished by the stenographic record that the trial justice did not have available at the time, we hereby modify the sentence to that period of time that has already been served by the petitioners. Otherwise, the judgments holding the petitioners in contempt are sustained.

For the reasons stated, the petitions for habeas corpus are granted in part and denied in part and the remaining portions of the petitioners' sentences are vacated. The judgments finding the petitioners in contempt are affirmed. The papers in the case are remanded to the Superior Court for entry of modified judgments consistent with this opinion.

KELLEHER, Justice, with whom BEVILACQUA, Chief Justice, joins, dissenting.

I would vacate the judgment of contempt and the ten-day sentence imposed on each of the petitioners.

Over half a century ago in *Rhode Island Bar Association v. Automobile Service Association*, 55 R.I. 122, 129, 179 A. 139, 142 (1935), this court, in referring to the power to punish for contempt, said, "This inherent power of the judiciary to punish for contempt is a necessary but also a dangerous power, and is therefore to be used with great caution." There the court was speaking of the contempt power in the context of a controversy in which the respondents were charged with engaging in the unauthorized practice of law. Here, of course, we are concerned with Rule 42(a) of the Superior Court Rules of Criminal Procedure, which relates to the summary imposition of punishment.

In this jurisdiction the imposition of such punishment is authorized if it "be shown that the contempt in its nature was direct in its adverse effect upon the authority and prestige of the court." *Noble v. Siwicki*, 97 R.I. 288, 291–92, 197 A.2d 298, 301 (1964). Moreover, because the contempt

fills "the need for immediate penal vindication of the dignity of the court," *Cooke v. United States,* 267 U.S. 517, 536, 45 S.Ct. 390, 395, 69 L.Ed. 767, 774 (1925), it is confined to "unusual situations * * * where instant action is necessary to protect the judicial institution itself." *Harris v. United States,* 382 U.S. 162, 167, 86 S.Ct. 352, 356, 15 L.Ed.2d 240, 243–44 (1965). Later, in *United States v. Wilson,* 421 U.S. 309, 319, 95 S.Ct. 1802, 1808, 44 L.Ed.2d 186, 194 (1975),[4] in outlining the exceptional circumstances in which a court may properly impose summary contempt, the Court emphasized that "only '[t]he least possible power adequate to the end proposed'" should be employed in contempt proceedings. Again, in *State v. Costantino,* 107 R.I. 215, 219–20, 266 A.2d 33, 35 (1970), this court stressed:

> "[T]he rule permitting summary punishment in such cases [direct contempt] contemplates conduct that effects a serious and substantial challenge to the authority of the court and cannot be allowed to go unpunished without risking a substantial erosion of our whole adjudicatory system."

The critical issue before us is: Was there a compelling need for the summary imposition of the ten-day sentences? Such a need arises when there has been a substantial disruption in the progress of the trial. The record clearly indicates that there was no such disruption here.

The trial justice's actions as he finished the imposition of sentence on the so-called *Boston* defendants have been preserved on videotape, a copy of which has been furnished to this court by WLNE, Channel 6. After the trial justice had imposed sentence on the last of the *Boston* defendants, he said, "Madame clerk, would you read the sentence imposed as to each defendant. Sheriff, would you remove those people who have turned their backs to this court and hold them in the corridor for further proceedings before me * * *." The removal process took about fifty seconds. There was no pushing or shoving or dragging, for all five spectators left the courtroom in a peaceful manner. The clerk then read the sentences that had been previously imposed on each of the *Boston* defendants. An hour after their departure, the five contemners in the contempt proceedings now under review were brought before the trial justice individually, and each received a ten-day sentence.

An examination of the videotape indicates that the only interruption in the sentencing process came when the trial justice directed the sheriff to escort the five contemners from the courtroom. This directive was complied with in less than a minute. This episode was neither a "serious and substantial" challenge to the authority of the court nor a "substantial disruption" of the hearing. On the contrary, once the quintet had completed its turnaround, the group, in response to the trial justice's directive, quietly and peacefully left the courtroom and was taken to a nearby office to await further word from the trial justice. Time was no longer of the essence as the quintet waited for further word concerning its fate.

In my opinion, when the quintet returned to the "cleared courtroom," if the trial justice was still of a mind to impose sanctions, and he was, then the contemners were entitled to the protection afforded by Rule 42(b), which includes a notice (1) stating the time and place of the hearing, (2) allowing a reasonable time for preparation of the defense, and (3) stating the essential facts that have constituted the criminal-contempt charge. An hour after the turnaround epi-

---

**4.** In *United States v. Wilson,* 421 U.S. 309, 95 S.Ct. 1802, 44 L.Ed.2d 186 (1975), summary punishment was imposed on two witnesses who, even though they had been given immunity, refused to testify for the government. In upholding the trial justice's use of Super.R.Crim.P. 42(a), the Supreme Court emphasized that the witnesses, by their actions, had totally disrupted the progress of the trial but also acknowledged that there could be instances when time was not of the essence and resort to Rule 42(b) would seem more appropriate.

sode, there was no longer a compelling need for instantaneous punishment.

Again, the trial justice, in explaining his reasons for summoning each individual defendant before him, emphasized, "As a result of your conduct, I ordered you to be seated. You ignored my request." Here, as noted by my colleagues, the trial justice was in error. The videotape records the trial justice's entire involvement with those who engaged in the turnaround maneuver and clearly indicates that no such request was made.[5] If the trial justice's imposition of the ten-day sentences was based on the failure of the contemners to return to their seats, then there is a problem here as no such command was ever given.

I have no intention of nullifying a trial justice's power to deal effectively with offensive, disrespectful, or disruptive language or gestures. However, the trial justice is required to assess the severity of the obstruction and to use the "least possible power adequate to the end proposed." When immediate punishment is not warranted, a trial justice can and should invoke the notice-and-hearing provisions of Rule 42(b). When the language or gestures substantially or materially obstruct the proceedings in a way that necessitates immediate treatment, the trial justice is fully empowered and justified in resorting to the summary procedure set forth in Rule 42(a).

For the reasons stated, I believe that the trial justice's use of the provisions of Rule 42(a) constituted an abuse of discretion and that his recollection of what he told the quintet before banishing it from the courtroom is clearly wrong. I would vacate the judgment entered below and remand the case for a Rule 42(b) hearing in Superior Court.

BEVILACQUA, C.J., participated in the oral argument and in the decision of the court but retired prior to the publication of this opinion.

5. Although in this dissent I have consistently referred to the videotaped portrayal of these proceedings, the stenographic report of the proceedings is identical to that of the videotape.