OPINION
{¶ 1} Defendant-appellant, Glenn Scott, appeals from a Mahoning County Common Pleas Court judgment convicting him of aggravated murder with a firearm specification following a jury trial.
 {¶ 2} On November 23, 2003, 16-year-old James Revere, aka Spreewell, was shot five times and killed at the intersection of Hayman and Covington Streets on the north side of Youngstown. Witnesses implicated appellant in the shooting along with Stephen Breedlove and Keon Richardson.
 {¶ 3} According to eyewitnesses, Revere was spotted driving down Covington. Appellant and his codefendants were seen driving up and down nearby Griffith Street and then eventually witnesses spotted them at the corner of Hayman and Covington Streets. Appellant was named as the driver with Breedlove and Richardson as his passengers. The men opened fire on Revere while he was still in his car. The three then fled the scene.
 {¶ 4} On December 4, 2003, a Mahoning County grand jury indicted appellant by direct presentment, jointly with Breedlove and Richardson, on one count of aggravated murder, a first-degree felony in violation of R.C. 2903.01(A)(F) and R.C. 2929.03(A)(1) with a firearm specification in violation of R.C. 2941.146(A).
 {¶ 5} Because appellant was indicted with Breedlove and Richardson, the three were to have a joint trial. However, at one point, the trial court granted appellant a separate trial.
 {¶ 6} On April 20, 2005, plaintiff-appellee, the State of Ohio, filed a motion for joinder. In the motion, appellee alleged that it had originally planned to call Larese Jones at trial who would testify that after the murder took place, appellant made incriminating statements to him. However, appellee stated that after further evaluation, it decided not to use Jones' testimony. The use of Jones' testimony was apparently the reason why the trial court had granted separate trials for the defendants. Since it decided not to use Jones' testimony, appellee sought to have appellant's trial joined once again with Breedlove's and Richardson's trials. Appellant opposed the motion and filed a request for a separate trial. *Page 2 
 {¶ 7} The court initially denied appellee's motion. But the court reconsidered its joinder decision. The court noted that appellee no longer intended to call Jones as a witness. However, it also noted that Richardson's counsel did intend to call Jones as a witness. Given that it appeared Jones would be called to testify in Richardson's case and not in appellant's case, the court determined that Richardson's trial would be severed from appellant's trial and appellant's trial would be joined with Breedlove's trial. (May 2, 2005 Tr. 2-6).
 {¶ 8} The matter proceeded to trial. The jury found both appellant and Breedlove guilty of aggravated murder and the accompanying firearm specification. The court later sentenced appellant to life in prison with parole eligibility after 20 years and another five years actual incarceration for the firearm specification to be served prior to and consecutive to his aggravated murder sentence.
 {¶ 9} This court granted appellant a delayed appeal on March 27, 2006.
 {¶ 10} Appellant raises four assignments of error. We will address them out of order for ease of discussion.
 {¶ 11} Appellant's second assignment of error states:
 {¶ 12} "DEFENDANT-APPELLANT WAS DENIED HIS RIGHT TO A PUBLIC TRIAL WHEN THE TRIAL COURT CLOSED THE COURTROOM TO SPECTATORS IN CONTRAVENTION TO THE PROTECTIONS OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I 10 AND 16 OF THE OHIO CONSTITUTION."
 {¶ 13} Here appellant contends that he was denied his right to a public trial. Prior to calling Larese Jones to testify, the state moved to close the courtroom for Jones' testimony due to an alleged threat to Jones' family. Appellant objected. The court sustained the state's motion. The court gave its reasons for doing so on the record. That portion of the transcript was sealed by the court. We have thoroughly reviewed the sealed transcript and the court's reasons for closing the courtroom.
 {¶ 14} Appellant first argues that the court should have investigated the matter to see if it could substantiate the threats before simply closing the courtroom. He *Page 3 
contends the court should have questioned Jones and the others involved regarding the alleged threat.
 {¶ 15} Secondly, appellant argues that the closure of the courtroom was broader than necessary. He contends that it was not necessary to exclude all spectators and most of the media. Since the person who allegedly made the threat was present, appellant argues the court should have questioned her. Appellant seems to further argue that the court could have simply not permitted the person who made the alleged threat in the courtroom during Jones' testimony.
 {¶ 16} Thirdly, appellant contends that there is no evidence on the record that the court considered any alternatives other than closing the courtroom.
 {¶ 17} Finally, appellant asserts that the court failed to make any validated findings on the record or in a judgment entry in support of its decision to close the courtroom.
 {¶ 18} The Sixth Amendment to the United State Constitution provides in part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." This right is also set out in the Ohio Constitution, Article I, Section 10: "In any trial, in any court, the party accused shall * * * have * * * a speedy public trial." Public trials ensure that the judges and prosecutors carry out their duties responsibly, encourage witnesses to come forward, and discourage perjury. Waller v. Georgia (1984), 467 U.S. 39, 47, 104 S.Ct. 2210, 81 L.Ed.3d 31 citing In re Oliver (1948), 333 U.S. 257, 270, 68 S.Ct. 499,92 L.Ed. 682.
 {¶ 19} Nonetheless, the right to a public trial is not an unconditional right, and may be overridden by a more dominant interest. Id. "The right to a public trial is not absolute, and in some instances must yield to other interests, such as those essential to the administration of justice." State v. Drummond, 111 Ohio St.3d 14,854 N.E.2d 1038, 2006-Ohio-5084, at ¶ 51.
 {¶ 20} Once a party objects to a court's decision to close the courtroom during trial, the Sixth Amendment requires application of a four-prong test as set forth in Waller, supra. State v. Alexander, 7th Dist. No. 03-CA-789, 2004-Ohio-5525, at ¶ 20. *Page 4 
"First, the party seeking to close the trial or some portion of it must assert an overriding interest. Second, any closure must be narrowly tailored to protect that interest. Third, the trial court must consider reasonable alternatives to closing the courtroom. Finally, the court must make findings on the record adequate to support the closure." Id.
 {¶ 21} Recently in Drummond, supra, the Ohio Supreme Court addressed the issue of closing a courtroom to the public. In Drummond, the judge closed the courtroom during the cross examination of one witness and the testimony of two other witnesses. The media was permitted to remain in the courtroom during this time. Relying on federal case law, the Court stated that when a trial judge orders a partial, instead of a total closure of a court proceeding, a "substantial reason" rather thanWaller's "overriding interest" will justify the closure.Drummond, 2006-Ohio-5084, at ¶ 53.
 {¶ 22} The Court in Drummond concluded that the trial court's closure order complied with Waller, supra. As to the first factor, the Court noted that there had been a physical altercation between a spectator and courtroom deputies, and that a second incident occurred in the judge's chambers. Id. at ¶ 54. The Court further pointed to the trial court's finding that "the fear of retaliation expressed by various witnesses" was a basis for its action. Id. The case involved gang-related activity and the Court acknowledged the dangerous nature of gang violence and the need to protect witnesses testifying against gang members from the threat of retaliation. Id. Thus, the Court concluded that the trial court had a substantial reason to close the courtroom.
 {¶ 23} As to the second factor, the Drummond Court found that the closure was no broader than necessary. Id. at ¶ 55. It noted that the trial court only closed the courtroom for the cross examination of one witness and the testimony of two other witnesses. Id. The Court also pointed out that while spectators had to vacate the courtroom, the media was permitted to remain. Id. It emphasized the fact that media presence helped to safeguard Drummond's right to a public trial because the *Page 5 
witnesses' awareness of the media minimized the risk that they would alter their testimony. Id.
 {¶ 24} As to the third factor, the Court observed that the record did not show the trial court considered alternatives to closure. Id. at ¶ 57. However, the Court did not find this significant because this was only a partial closure during cross-examination of one witness and the testimony of two others. Id.
 {¶ 25} And as to the fourth factor, the Court noted that the trial court stated there had been a physical altercation between spectators and courtroom deputies, it mentioned another incident had occurred in the judge's chambers, and witnesses had expressed fear of retaliation by testifying in open court. Id. at ¶ 58. The Court found these reasons a bit lacking; however, it went on to state that the strength of the judge's actual findings must be evaluated in reference to the limited scope of the closure. Id. at ¶ 58. The Court concluded: "Under these circumstances, where there is an interest in maintaining courtroom order and security, the trial court did not abuse its discretion in ordering the limited closure of the courtroom." Id.
 {¶ 26} Like the Ohio Supreme Court in Drummond, we must consider theWaller factors. In this case, the judge did not close the courtroom to the media and its closure to the public was only during the testimony of one material witness and another witness whose testimony was ancillary to Jones' testimony. Thus, like Drummond, this case involved a partial, instead of a total closure of the courtroom. Therefore, the state only had to present a substantial reason for seeking to close the courtroom instead of an overriding interest. It did so. The state informed the court of the alleged threat to Jones' family, which was supposedly made on the morning that Jones was to testify. The court noted two other reasons in the sealed record that lent further support to the prosecutor's request. Given these circumstances, a substantial reason existed to close the courtroom during Jones' testimony.
 {¶ 27} Secondly, the closure was narrowly tailored in this case. This trial lasted over a week and twenty witnesses testified. The court only closed the courtroom for two witnesses' testimony — Jones and another witness whose *Page 6 
testimony was secondary to Jones' testimony. Furthermore, the court allowed the media to remain in the courtroom during its closure. As the Supreme Court noted in Drummond, by allowing the media to remain, appellant's right to a public trial was further safeguarded.
 {¶ 28} Thirdly, the record does not demonstrate that the trial court considered alternatives to closing the courtroom. However, failing to do so does not lead to the conclusion that appellant's right to a public trial was violated. The Supreme Court excused this failure inDrummond given the fact that the case involved only a partial closure during cross-examination of one witness and the testimony of two other witnesses. In this case, the courtroom was closed for an even shorter period of time. Thus, the court's failure to consider alternatives does not lead to the conclusion that appellant's right to a public trial was violated.
 {¶ 29} Finally, after reviewing the court's findings, we conclude that they were adequate to support the closure. While the court could have made more detailed findings, its reasons for closing the courtroom were at least as substantial, if not more substantial, than those given by the trial court in Drummond. And while the Supreme Court made clear that it would have preferred more detailed findings by the trial court inDrummond, it nonetheless concluded that under the circumstances, where courtroom order and security were involved and where the scope of the courtroom closure was limited, the trial court did not abuse its discretion. It follows that in this case too, the trial court did not abuse its discretion in closing the courtroom for the limited purpose of Jones' testimony.
 {¶ 30} Accordingly, appellant's second assignment of error is without merit.
 {¶ 31} Appellant's third and fourth assignments of error share a common basis in law and fact. Therefore, we will address them together. They state respectively:
 {¶ 32} "THE TRIAL COURT DENIED APPELLANT DUE PROCESS UNDER THEFOURTEENTH AMENDMENT DUE TO THE FACT HIS CONVICTION FOR AGGRAVATED MURDER AND A FIREARM SPECIFICATION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE JURY'S VERDICT WAS *Page 7 
INCONSISTENT WITH THE EVIDENCE AND TESTIMONY PRESENTED AT TRIAL."
 {¶ 33} "APPELLEE FAILED TO ADDUCE SUFFICIENT EVIDENCE AT TRIAL TO ESTABLISH APPELLANT WAS THE PRINCIPAL OFFENDER IN THE AGGRAVATED MURDER OF JAMES REVERE IN CONJUNCTION WITH APPELLANT'S THIRD ASSIGNMENT OF ERROR."
 {¶ 34} Here appellant argues that his conviction is against both the sufficiency and the weight of the evidence. First, we will examine appellant's argument that there was insufficient evidence to support his conviction.
 {¶ 35} Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the jury verdict.State v. Smith (1997), 80 Ohio St.3d 89, 113, 684 N.E.2d 668. In essence, sufficiency is a test of adequacy. State v. Thompkins (1997),78 Ohio St.3d 380, 386, 678 N.E.2d 541. Whether the evidence is legally sufficient to sustain a verdict is a question of law. Id. In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Smith, 80 Ohio St.3d at 113.
 {¶ 36} Three eyewitnesses testified against appellant.
 {¶ 37} First, Anita Marshall testified. She and Arielle Brown are sisters. On the morning of the shooting she was at Brown's apartment on Griffith Street. The two were standing outside with some other girls when they noticed a burgundy car drive slowly by and later saw the same car drive up Griffith. (Tr. 574, 576). Marshall recognized the people in the car as appellant, Breedlove, and Richardson. (Tr. 574). Marshall stated that she knew all three men from going to school together and "around the neighborhood." (Tr. 575). She stated that appellant was the driver, Breedlove was on the passenger side, and Richardson was in the backseat. (Tr. 574-75). *Page 8 
 {¶ 38} Marshall stated that the girls also recognized another car. She stated that they saw a car, which she identified as Sholanda Bohazi's car, driving down Covington Street. (Tr. 577). At that time, Marshall stated, the defendants' car was at the corner of Covington and Madison and she saw it turn onto Covington. (Tr. 577-78). Marshall stated that Brown then took off running toward the two cars because she thought her ex-boyfriend was the one driving Bohazi's car. (Tr. 578-79). Marshall stated that she followed her sister and then the shooting started. (Tr. 579-80). Marshall stated that from her view on Covington where she was standing on the bridge, she saw Breedlove and Richardson shooting. (Tr. 580-81). She stated that although there is a guardrail and a fence on the bridge, she could see everything clearly. (Tr. 640). By this time, the victim had backed the car he was driving into a pole. (Tr. 581).
 {¶ 39} Next, Marshall stated that Breedlove and Richardson got out of the car. (Tr. 581). She testified that Breedlove was still shooting at this time but remained close to the car he had been riding in. (Tr. 581-82). Richardson, she stated, walked towards Revere, who was still in Bohazi's car, and continued shooting at him. (Tr. 582). After they stopped shooting, Marshall stated that she saw either Breedlove or Richardson drop a Black Mild cigar and a lighter on the ground, which was a sign of disrespect to the victim's mother. (Tr. 582, 591). Marshall stated that they then got back in their car and left the scene, again with appellant driving. (Tr. 582-83).
 {¶ 40} Marshall also testified that a police officer came to her house a few days later with two photo arrays for her to look at. (Tr. 585). Out of the first photo array she identified Richardson and out of the second array Marshall identified appellant as being two of the people she saw shooting at Revere. (Tr. 587).
 {¶ 41} Detective Sergeant Daryl Martin testified that Marshall told him that appellant, Breedlove, and Richardson were the people who killed Revere. (Tr. 1006). Detective Martin stated that Marshall told him that Richardson got out of the car and approached Revere and that Richardson was the one who threw the cigar on the ground. (Tr. 1006-07). He also corroborated that Marshall picked appellant and *Page 9 
Richardson out of photo arrays. (Tr. 1007). And Detective Martin stated that Marshall told him that all three men were shooting. (Tr. 1102).
 {¶ 42} During much of her testimony, Marshall stated that only Breedlove and Richardson were shooting at Revere. However, at one point she stated that appellant was also shooting at Revere and this was what she reported to Detective Martin just days after the shooting.
 {¶ 43} Second, Brown testified. Brown's testimony was the same as Marshall's regarding where the girls were and the two cars they saw. (Tr. 665-67). She too identified appellant, Breedlove, and Richardson and stated that appellant was the driver, Breedlove was in the front passenger seat, and Richardson was in the back seat on the driver's side. (Tr. 667). Brown stated that she knew the men prior to this incident from growing up around them. (Tr. 668). Brown stated that she thought her ex-boyfriend, Raymond Hammond, was driving the second car. (Tr. 670). She also thought it was suspicious that appellant, Breedlove, and Richardson were in the Westlake Project area. (Tr. 670-71). For this reason, Brown stated that she ran after the car she thought Hammond was driving. (Tr. 670-71).
 {¶ 44} When she approached the end of the bridge on Covington by Madison, Brown stated that she heard gunshots. (Tr. 671-72). She stated that Revere was on Hayman Street close to Covington by this time and the defendants' car was at the corner of Hayman and Covington. (Tr. 671). Brown testified that she first saw and heard gunfire coming from the car that appellant was driving. (Tr. 672-73). At that time, Brown stated that the gunfire was only coming from the passenger side of the car where Breedlove was seated. (Tr. 673). She stated that Breedlove was firing a weapon. (Tr. 674). Brown testified that she then saw Richardson exit the defendants' car, run up to the car that Revere was in, and shoot into it. (Tr. 673). Brown stated that appellant was the driver the entire time. (Tr. 674-75).
 {¶ 45} Brown stated that she went to the police station that day. At the police station, she was shown three photo arrays. Brown stated that she picked appellant, Breedlove, and Richardson out of the photo arrays. (Tr. 680). *Page 10 
 {¶ 46} On cross-examination, Brown admitted to some inconsistencies among her testimony, a statement that she gave to police, and testimony she gave at a motion to suppress hearing. The inconsistencies dealt with why she started running towards the car Revere was driving, where she was standing when she first heard shots fired, the fact that she did not write in her statement that she saw Breedlove shooting, and the fact that she wrote in her statement that she saw one person, Richardson, get out of the car but she testified at the suppression hearing that she saw two people get out of the car. (Tr. 723-31).
 {¶ 47} Detective Martin also testified about what Brown told him. According to Martin, Brown identified appellant, Breedlove, and Richardson as being involved in Revere's murder. And he stated that Brown picked the three men out from photo arrays. (Tr. 993-94). Detective Martin stated that Brown told him that Richardson got out of the car and shot into the car Revere was driving. (Tr. 995).
 {¶ 48} Third, Kenneth Findley testified. Findley stated that on the day in question he left church and was driving on Covington towards Hayman when he heard shots being fired. (Tr. 817). He testified that he saw one car back up into a pole and a burgundy car approach it. (Tr. 817). Findley stated that three people were in the burgundy car and that at least two of them were shooting. (Tr. 818). He stated that it seemed that the person in the backseat was shooting and that the person in the front passenger seat was shooting. (Tr. 819). Findley stated that when the burgundy car stopped, the person in the backseat got out and fired more shots at the car that had backed into the pole. (Tr. 823).
 {¶ 49} Findley stated that he saw the three men in the car but did not get a good look at them. (Tr. 827). He also stated that he knew who appellant, Breedlove, and Richardson were prior to the shooting. (Tr. 827). And while he picked Breedlove out of a photo array as possibly being one of the men involved, he could not identify appellant as being involved. (Tr. 828-29).
 {¶ 50} Detective Martin testified that when he interviewed Findley, Findley indicated to him that all three men were shooting from the car. (Tr. 1103). *Page 11 
 {¶ 51} In addition to these eyewitnesses, numerous other witnesses' testimony was relevant.
 {¶ 52} Sholanda Bohazi, the owner of the car that Revere was driving, testified that she and Revere were friends. She stated that the night before the murder, Revere had spent the night at her house. (Tr. 748). Around noon the next day, Bohazi stated, Revere used her car to drop off her nephew at her mother-in-law's house. (Tr. 749). After dropping off her nephew, Bohazi stated, Revere called her and told her that he was at "some dude house" and that he sounded scared and upset. (Tr. 751). Bohazi testified that Revere told her that he was being followed by appellant, Breedlove, and Richardson. (Tr. 763). Bohazi stated that approximately five minutes later she received a phone call that Revere had been shot. (Tr. 763-64).
 {¶ 53} Bohazi also testified that in the week prior to his death, Revere received a threat from Breedlove. (Tr. 755-56). She stated that Breedlove had left a message on Revere's pager, which he played for her, stating something to the effect of "he was gonna kill him" because of who he was "hanging with." (Tr. 756). Bohazi stated that she recognized Breedlove's voice on the message. (Tr. 756). She stated that she knew Breedlove from going to school with him. (Tr. 754).
 {¶ 54} On cross-examination, Bohazi admitted that although she knew Breedlove, she had not had conversations with him or spoken with him on the telephone. (Tr. 774). She stated that she was not friends with Breedlove because of "bad blood." (Tr. 781). Additionally, Bohazi admitted that she did not volunteer any information to police on the day of the shooting. (Tr. 777-78).
 {¶ 55} Detective Martin testified that Bohazi did mention something to him about looking for Revere's pager. (Tr. 1058). However, he did not recall Bohazi relaying information about a threat from Breedlove. (Tr. 1058).
 {¶ 56} Officer Robert Mauldin testified that casings from two different weapons were found at the scene. (Tr. 875). However, some of the casings had been moved from their original positions into a pile by Councilman Richard Atkinson who happened to be near the scene. (Tr. 955). The casings that had been moved were *Page 12 
9mm and the others were .380mm. (Tr. 875). Jonathan Gardner, a firearms examiner for the Bureau of Criminal Identification and Investigation (BCI), testified that all of the 9mm casings had come from the same gun and all of the .380mm casing had come from the same gun. (Tr. 928, 931). He also testified that the bullets found in Revere's body and in his car were .380mm. (Tr. 932).
 {¶ 57} Detective Martin testified that a cigar was also found at the scene. (Tr. 968). Melissa Zielaskiewicz, a forensic scientist in the serology DNA section at BCI, testified regarding the cigar. She concluded that DNA found on the cigar belonged to Richardson. (Tr. 1082-83).
 {¶ 58} Finally, Dr. Robert Belding, the deputy coroner, testified that multiple gunshot wounds caused Revere's death. (Tr. 1128-29). He later stated that this caused Revere to go into hypovolemic shock. (Tr. 1139). Of the five gunshot wounds, Dr. Belding recovered three slugs from Revere's body. (Tr. 1132).
 {¶ 59} After the state presented its case-in-chief, appellant presented his defense. Appellant called three witnesses on his behalf and then took the stand in his own defense. The three witnesses appellant called, Jimette Scott, Rhonda Johnson, and Nicole Scott, are his cousins. They testified that Nicole hosted a sleepover birthday party for her daughter Rakia the night before the shooting. (Tr. 1166-67, 1183-84, 1206-07). All three were there the next morning and throughout the day. (Tr. 1166-67, 1183-84, 1206). Revere's younger sister was at the sleepover party. (Tr. 1169-70, 1216).
 {¶ 60} Jimette testified that around 10:00 a.m. on the morning of the shooting, appellant arrived at Nicole's house. (Tr. 1167). The two had some breakfast, smoked a cigar, and went up to Rakia's room to talk. (Tr. 1167-68). Jimette stated that appellant fell asleep there. (Tr. 1168). She stated that he stayed there continuously until about 4:00 or 4:30 p.m. (Tr. 1168, 1170). Jimette stated that while appellant was still at Nicole's house, she received a phone call informing her of the shooting and the caller stated that appellant was being blamed for it. (Tr. 1168-69). However, Jimette stated that appellant was still at Nicole's house when she received *Page 13 
this phone call. (Tr. 1169). She stated that she woke appellant up to tell him about the phone call. (Tr. 1169). Finally, Jimette testified that appellant arrived at Nicole's house driving his girlfriend's car and that he left when his girlfriend picked him up driving her mother's car. (Tr. 1174).
 {¶ 61} Johnson testified next. She stated that appellant arrived at Nicole's house around 10:30 or 11:00 a.m. (Tr. 1184). Johnson stated that appellant went to Rakia's room and watched television. (Tr. 1185). She did not stay in Rakia's room with appellant, but saw him later around lunchtime and again later in the day. (Tr. 1185). Johnson stated that appellant left Nicole's house around 3:00 p.m. (Tr. 1185). On cross-examination, Johnson admitted that she never told police that appellant was at Nicole's house on the day in question. (Tr. 1192).
 {¶ 62} Nicole testified next. She stated that appellant arrived at her house around 10:30 or 11:00 a.m. on the day in question. (Tr. 1207). She saw him in her house around that time. (Tr. 1209). Nicole then fell asleep. (Tr. 1209-10). She stated that she later noticed appellant asleep on the floor in Rakia's room. (Tr. 1210). Nicole testified that she left her house around 3:00 p.m. and appellant was still there. (Tr. 1210). On cross-examination, Nicole admitted that she never called the police to inform them that appellant had been at her house that day. (Tr. 1214).
 {¶ 63} Finally, appellant took the stand in his own defense. He testified that on the day in question, he went to Nicole's house to see his cousin Rakia for her birthday and to have something to eat. (Tr. 1222). He stated that he drove his girlfriend's car there and arrived around 11:00 or 11:30 a.m. (Tr. 1222). He stated that when he arrived he talked with Jimette in the kitchen and had something to eat. (Tr. 1223-24). Afterwards, appellant stated that he went to Rakia's room, talked with her for a little while and then fell asleep. (Tr. 1224-25). Appellant testified that Jimette then woke him up to tell him about the shooting and to tell him that his name was involved with it. (Tr. 1225-26). He stated that he dosed off for a little while longer, woke up, hung out in the basement for a while, and then left. (Tr. 1226). Appellant stated that he left between 3:30 and 4:00 p.m. (Tr. 1227). He stated that *Page 14 
his cousin's boyfriend's cousin picked him up. (Tr. 1227). Finally, appellant testified that on that day he was never in the area of Hayman Street, he never saw Revere, and he had nothing to do with the shooting. (Tr. 1229-30).
 {¶ 64} On cross-exam, appellant stated that he knew of Jones and saw him while the two were in the county jail. However, appellant stated he did not talk to Jones. (Tr. 1240-41).
 {¶ 65} To rebut appellant's alibi defense, the state called Larese Jones. Jones' testimony was sealed by order of the trial court. We have reviewed his testimony and considered it along with the rest of the evidence.
 {¶ 66} Appellant argues that this evidence was insufficient to convict him of aggravated murder because the state did not prove that he was the principal offender. He further argues that the evidence merely showed that he was the driver of the car in which the others were riding. He contends that the evidence demonstrated that Richardson was the principal offender because he was the one who shot Revere at close range.
 {¶ 67} The jury convicted appellant of aggravated murder in violation of R.C. 2903.01(A). Thus, they were required to find that appellant "purposely, and with prior calculation and design, cause[d] the death of another." To act purposely is to act with a "specific intention to cause a certain result." R.C. 2901.22(A).
 {¶ 68} Sufficient evidence exists to support appellant's conviction. Although Marshall testified at one point that only Breedlove and Richardson were shooting at Revere, at another point she testified that appellant too was shooting. Additionally, Marshall told Detective Martin that all three men were shooting at Revere. And Dr. Belding testified that Revere died from multiple gunshot wounds. This evidence, when construed in appellee's favor, leads to the conclusion that appellant caused Revere's death. Moreover, Bohazi testified that just minutes before his death, Revere called her and told her that appellant and the others were following him. This demonstrated that appellant acted with prior calculation and design.
 {¶ 69} Based on this evidence and the evidence under seal, we conclude that *Page 15 
sufficient evidence existed to support appellant's conviction. Thus, his fourth assignment of error is without merit.
 {¶ 70} Next, we must consider appellant's argument that his conviction was against the manifest weight of the evidence.
 {¶ 71} In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Thompkins, 78 Ohio St.3d at 387. "Weight of the evidence concerns `the inclination of the greater amountof credible evidence, offered in a trial, to support one side of the issue rather than the other.'" Id. (Emphasis sic.) In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. Id. at 390.
 {¶ 72} Still, determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts.State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.
 {¶ 73} Appellant contends the most the evidence established was that he was merely present in the car when Breedlove and Richardson opened fire on Revere. He contends the evidence did not establish that he acted in any way to facilitate the murder.
 {¶ 74} But a review of the evidence demonstrates otherwise. Bohazi testified that just minutes before he was shot, Revere called her and told her that appellant, Breedlove, and Richardson were following him. Marshall and Brown testified that appellant was the driver of the car containing Breedlove and Richardson. Thus, three people placed appellant in the car with Breedlove and Richardson just prior to the shooting. Additionally, DNA evidence found on the cigar dropped at the scene linked Richardson to the scene. This evidence substantiated the identification of Richardson by the witnesses and lent further credence to their identifications of *Page 16 
appellant and Breedlove.
 {¶ 75} Marshall and Brown testified that they did not see appellant shoot at Revere. However, Marshall also later testified that she did see appellant shoot at Revere. And Marshall told Detective Martin just days after the shooting that all three men, including appellant, were shooting at Revere. Furthermore, Findley testified that "at least" two men were shooting from the car. And Detective Martin stated that when he interviewed Findley, Findley seemed to indicate that all three men were shooting. Thus, when the incident was fresh in their minds, both Marshall and Findley advised Detective Martin that all three men were shooting at Revere.
 {¶ 76} Additionally, as noted above, we have considered Jones' testimony.
 {¶ 77} Given the evidence, we cannot conclude the jury clearly lost its way in finding appellant guilty or that its verdict was against the weight of the evidence. Accordingly, appellant's third assignment of error is without merit.
 {¶ 78} Appellant's first assignment of error states:
 {¶ 79} "THE TRIAL COURT ERRED IN OVERRULING DEFENDANT-APPELLANT'S MOTION FOR SEPARATE TRIAL AND GRANTING PLAINTIFF-APPELLANT'S [sic] MOTION FOR JOINDER HEREIN."
 {¶ 80} Appellant argues that the evidence against Breedlove was overwhelming and the evidence against him was slight. Therefore, he contends that the jury was unable to consider the evidence separately against him and Breedlove, resulting in an unfair trial for him.
 {¶ 81} Generally, the law favors joinder of codefendants for trial. "Joinder conserves judicial and prosecutorial time, lessens the not inconsiderable expenses of multiple trials, diminishes inconvenience to witnesses, and minimizes the possibility of incongruous results in successive trials before different juries." State v. Thomas (1980),61 Ohio St.2d 223, 225, 400 N.E.2d 401. However, in some cases joinder can be prejudicial to a defendant. Crim.R. 14 provides for relief from prejudicial joinder, stating that "[i]f it appears that a defendant * * * is prejudiced by a joinder * * * of defendants * * * for trial * * *, the court shall * * * grant a severance of *Page 17 
defendants, or provide such other relief as justice requires."
 {¶ 82} An appellate court reviews a trial court's decision on joinder for abuse of discretion. State v. Bundy, 7th Dist. No. 02-CA-211,2005-Ohio-3310, at ¶ 55. Abuse of discretion connotes more than an error of law or fact; it implies that the trial court's judgment is arbitrary, unreasonable, or unconscionable. State v. Adams (1980),62 Ohio St.2d 151, 157, 404 N.E.2d 144. We will not conclude that a trial court abused its discretion in refusing to grant severance where the prejudicial aspects of joinder are too general and speculative. Bundy,2005-Ohio-3310, at ¶ 55. "The test is `whether a joint trial is so manifestly prejudicial that the trial judge is required to exercise his or her discretion in only one way — by severing the trial. * * * A defendant must show clear, manifest and undue prejudice and violation of a substantive right resulting from failure to sever. * * *'" State v.Schiebel (1990), 55 Ohio St.3d 71, 89, 564 N.E.2d 54, quoting UnitedStates v. Castro (C.A.9, 1989), 887 F.2d 988, 996.
 {¶ 83} Appellant is unable to show that he was prejudiced by his joinder with Breedlove. Appellant claims that the evidence against Breedlove was overwhelming and the evidence against him was slight. Yet he makes no attempt to point out what evidence would not have been presented at his separate trial had he had one. As discussed in detail above, both the weight and the sufficiency of the evidence adduced at the joint trial supported appellant's conviction. Most, if not all, of the same evidence would have been used in appellant's trial had he been tried separately from Breedlove.
 {¶ 84} The only significant evidence that may not have been admitted at appellant's separate trial is Bohazi's testimony regarding the death threat made by Breedlove to appellant. But the rest of the damning evidence would have been the same.
 {¶ 85} The eyewitnesses testified as to what they saw. Their testimony would have been unchanged whether they testified at one joint trial or two separate trials because they were describing the events and the people they saw on the day of the *Page 18 
shooting. Furthermore, Jones' testimony would likely not have been admitted at Breedlove's separate trial. However, his testimony would have still come in at appellant's separate trial. Had the court granted appellant a separate trial, the same witnesses would have testified. Therefore, there would have been significant evidence on which to convict appellant. Consequently, the trial court did not abuse its discretion in ordering appellant to proceed with a joint trial.
 {¶ 86} Accordingly, appellant's first assignment of error is without merit.
 {¶ 87} For the reasons stated above, the trial court's judgment is hereby affirmed.
Vukovich, J., concurs.
 Waite, J., concurs. *Page 1