OPINION *Page 2 
{¶ 1} Defendant-appellant Stephen Breedlove appeals from his conviction in the Mahoning County Common Pleas Court for aggravated murder with a gun specification. Three issues are raised in this appeal. The first issue is whether the joining of his trial with the trial of his co-defendant Glenn Scott resulted in prejudice. The second issue is whether the conviction is against the manifest weight of the evidence. The third issue is whether Breedlove was denied his right to a public trial. For the reasons expressed below, the judgment of the trial court is affirmed.
 STATEMENT OF FACTS AND CASE {¶ 2} On November 23, 2003, 16-year-old James Revere, aka Spreewell, was shot five times and killed at the intersection of Hayman and Covington Streets on the north side of Youngstown. Witnesses implicated Breedlove, Glenn Scott, and Keon Richardson in the shooting.
 {¶ 3} According to eyewitnesses, Revere was spotted driving down Covington Street. Breedlove and his co-defendants were seen driving up and down nearby Griffith Street and then eventually witnesses spotted them at the corner of Hayman and Covington Streets. Scott was named as the driver with Breedlove and Richardson as his passengers. At least two, and possibly all three men, opened fire on Revere while he was still in his car. The three then fled the scene.
 {¶ 4} On December 4, 2003, a Mahoning County grand jury indicted Breedlove by direct presentment, jointly with Scott and Richardson, on one count of aggravated murder, a first-degree felony in violation of R.C. 2903.01(A)(F) and R.C. 2929.03(A)(1) with a firearm specification in violation of R.C. 2941.146(A).
 {¶ 5} Due to the fact that Breedlove was jointly indicted with Scott and Richardson, the three were set to have a joint trial. On March 8, 2004, Breedlove filed a motion for relief from prejudicial joinder asking the court to grant him a separate trial from Scott. In the motion, he asserted that Scott gave an incriminating statement to one Larese Jones inculpating himself, Breedlove, and Richardson. Therefore, Breedlove argued that if he proceeded in a joint trial with Scott, Scott's statements to Jones could be admitted at trial. The court initially granted Breedlove's motion for *Page 3 
relief from prejudicial joinder on March 31, 2004, thereby, severing Breedlove's trial from Scott's trial.
 {¶ 6} Breedlove next filed a motion for relief from prejudicial joinder asking the court to grant him a separate trial from Richardson. The court denied this motion.
 {¶ 7} On April 20, 2005, the state filed a motion for joinder. In the motion, the state alleged that it had originally planned to call Jones as a witness who would testify that after the murder took place, Scott made incriminating statements to him. However, after further evaluation, the state decided not to use Jones' testimony. Therefore, it sought to have Scott's trial joined once again with that of Breedlove and Richardson. The trial court initially denied the state's motion for joinder.
 {¶ 8} At the hearing on the state's joinder motion, Breedlove made an oral motion for relief from joinder to Richardson's trial. The trial court initially denied this motion.
 {¶ 9} The court, however, reconsidered both of its joinder decisions. The court noted that the state no longer intended to call Jones as a witness. However, it also noted that Richardson's counsel did intend to call Jones as a witness. Given that it appeared Jones would be called to testify in Richardson's case, the court determined that Breedlove's trial would be severed from Richardson's trial. (05/02/05 Tr. 2-6). However, since the state no longer intended to call Jones as a witness, the trial court determined that Scott's case would be joined with Breedlove's trial. (05/02/05 Tr. 2-6).
 {¶ 10} The case subsequently proceeded to a joint trial for Breedlove and Scott. The state called numerous witnesses to testify in its case in chief and then rested. Scott then presented his case. He presented an alibi that he was at his cousin's house at the time of the murder. Three of Scott's cousins testified as to Scott's whereabouts that day and Scott took the stand in his own defense denying any involvement in the murder. Thus, the state then had to rebut Scott's alibi. It called Jones in order to do this.
 {¶ 11} Breedlove moved for a mistrial arguing that this evidence was prejudicial to him and inadmissible against him. The court denied the motion and instead gave the jury a curative instruction telling them that they could only consider the state's rebuttal evidence against Scott and could not use it against Breedlove. *Page 4 
 {¶ 12} The jury found both Breedlove and Scott guilty of aggravated murder and the accompanying firearm specification. The court sentenced Breedlove to life in prison with parole eligibility after 20 years and another five years actual incarceration for the firearm specification to be served prior to and consecutive to his aggravated murder sentence.
 {¶ 13} Breedlove filed timely notice of appeal on July 1, 2005. His counsel initially raised two assignments of error. However, substitute counsel was required in this case. We have allowed Breedlove to raise a supplemental assignment of error, which his new appellate counsel filed later. Thus, Breedlove raises three assignments of error.
 FIRST ASSIGNMENT OF ERROR {¶ 14} "THE PREJUDICIAL JOINDER OF TWO OR MORE DEFENDANTS VIOLATES THESIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ART. I § 10 OF THE OHIO CONSTITUTION."
 {¶ 15} Breedlove argues that the only reason the court joined his trial with Scott's trial was because the prosecutor represented that the state was not going to call Jones to testify at trial. However, during trial, Scott raised an alibi defense causing the prosecutor to call Jones as a rebuttal witness after all. Breedlove moved for a mistrial, but the trial court denied his motion.
 {¶ 16} Breedlove contends that pursuant to Bruton v.United States (1968), 391 U.S. 123, the trial court was required to declare a mistrial once Jones testified and implicated Breedlove. He argues that although the court gave the jury a curative instruction directing them to disregard any implication of him in Jones' testimony, perBruton, the jury could not have disregarded the testimony. He asserts that there is no way a jury would be able to consider damning evidence against one defendant and completely ignore it in regards to the other defendant.
 {¶ 17} The state counters by arguing that the issue in Bruton was a confrontation issue. In that case, the state contends the confession of a non-testifying co-defendant was admitted and the trial court gave a limiting instruction telling the jury that they could only consider the confession against the confessing defendant. However, it argues in the present case that Scott testified. Therefore, according to the *Page 5 
state, Breedlove was able to cross-examine Scott about his statements to Jones. Additionally, the state argues that Breedlove failed to meet his burden under Crim.R. 14 of demonstrating that the joinder of his trial with Scott's trial affirmatively prejudiced his rights. It contends that whether Scott and Jones testified or not, the result would have been the same; Breedlove would have been convicted regardless of Jones' testimony. Thus, the state asserts that joinder in this case was not prejudicial.
 {¶ 18} The granting or denial of a motion for mistrial is in the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion. State v. Treesh, 90 Ohio St.3d 460, 480,2001-Ohio-4. Abuse of discretion connotes more than an error of law or fact; it implies that the trial court's judgment is arbitrary, unreasonable, or unconscionable. State v. Adams (1980),62 Ohio St.2d 151, 157. "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." State v. Franklin
(1991), 62 Ohio St.3d 118, 127.
 {¶ 19} Generally, the law favors joinder of co-defendants for trial. "Joinder conserves judicial and prosecutorial time, lessens the not inconsiderable expenses of multiple trials, diminishes inconvenience to witnesses, and minimizes the possibility of incongruous results in successive trials before different juries." State v. Thomas (1980),61 Ohio St.2d 223, 225. However, in some cases, joinder can be prejudicial to a defendant. Crim.R. 14 provides for relief from prejudicial joinder, stating that "[i]f it appears that a defendant * * * is prejudiced by a joinder * * * of defendants * * * for trial * * *, the court shall order * * * grant a severance of defendants, or provide such other relief as justice requires."
 {¶ 20} As stated above, Breedlove's argument centers on the United States Supreme Court case of Bruton v. United States. In that case, Bruton was convicted of armed postal robbery after a joint trial with his co-defendant, Evans. At trial, a witness testified that Evans confessed to him that Evans and Bruton committed the robbery. Evans did not testify. The trial court instructed the jury that they were only to consider Evans' confession against Evans and were not permitted to consider it against Bruton. The Supreme Court reversed Bruton's conviction holding that "because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of *Page 6 
Evans' confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of theSixth Amendment." Bruton, 391 U.S. at 125.
 {¶ 21} The Court reasoned that Bruton was denied his right to cross-examine Evans because Evans did not take the stand. Id. at 128. In making this ruling, the Court overruled its prior decision of DelliPaoli v. United States (1957), 352 U.S. 232, in which the Court relied on the premise that it was reasonably possible for the jury to follow sufficiently clear instructions to disregard a confessor's statement inculpating both himself and his co-defendant when determining the non-confessing co-defendant's guilt.
 {¶ 22} The Court relied on its decision in Jackson v. Denno (1964),378 U.S. 368, where it expressly rejected the idea that a jury, when determining a confessing co-defendant's guilt, could be relied on to ignore his confession should it find the confession involuntary.Bruton, 391 U.S. at 129, citing Jackson, 378 U.S. at 388-89.
 {¶ 23} The Bruton Court additionally relied on Justice Frankfurter's dissent in Delli Paoli where he wrote: "The fact of the matter is that too often such admonition against misuse is intrinsically ineffective in that the effect of such a nonadmissible declaration cannot be wiped from the brains of the jurors. The admonition therefore becomes a futile collocation of words and fails of its purpose as a legal protection to defendants against whom such a declaration should not tell.'"Bruton, 391 U.S. at 129, quoting Delli Paoli, 352 U.S. at 247.
 {¶ 24} Also, the Court noted that since Delli Paoli, Federal Crim.R. 14 had been amended to provide that when ruling on a motion for severance, the trial court may order the attorney for the government to deliver to the court for an in-camera inspection any statements or confessions made by the defendants that the government intends to introduce in evidence at the trial. Bruton, 391 U.S. at 131-32.
 {¶ 25} In conclusion, the Court stated:
 {¶ 26} "Here the introduction of Evans' confession posed a substantial threat to petitioner's right to confront the witnesses against him, and this is a hazard we cannot ignore. Despite the concededly clear instructions to the jury to disregard Evans' inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we *Page 7 
cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all." Id. at 137.
 {¶ 27} The present case is slightly different from Bruton. In this case, the confessing co-defendant — Scott — actually took the stand. Thus, Breedlove had the opportunity to cross-examine him. Therefore, the identical confrontation issue that was present in Bruton is not present in this case. However, a confrontation issue nonetheless exists here.
 {¶ 28} At the time Scott testified and put on his alibi defense, Breedlove's counsel did not know for certain if the state was going to call Jones to rebut the alibi. Thus, Breedlove would not have wanted to cross-examine Scott regarding an issue that had not been brought up. When Jones testified, he testified as to what Scott had allegedly told him. Hence, he relayed Scott's statement. In order to effectively question Scott's statement, Breedlove would have had to call Scott back to the stand. Scott could then assert his Fifth Amendment right not to testify. Therefore, Breedlove was in effect precluded from confronting Scott.
 {¶ 29} Furthermore, when Scott and Jones testified, the state had rested its case against Breedlove. Breedlove did not call any witnesses. And, Jones' testimony was only offered by the state against Scott. Thus, Breedlove did not technically have a right to rebut this evidence by calling Scott back to the stand because the case against Breedlove had concluded. Despite the state's insistence to the contrary, all of the above clearly shows a confrontation clause problem.
 {¶ 30} However, the trial court did give curative instructions. Before Jones testified, the court instructed the jury that they were only to consider Jones' testimony against Scott. Jones then testified. His testimony was sealed by order of the trial court. In its final instructions, the trial court directed the jury:
 {¶ 31} "In this case, the state of Ohio has presented rebuttal evidence. This rebuttal evidence and testimony must only be considered as evidence against the defendant, Glenn Scott, and cannot be considered against the defendant, Stephan Breedlove. *Page 8 
 {¶ 32} "Evidence may be admitted against one defendant even though it must not be considered as evidence against the other defendant. You must carefully separate such evidence and consider it only as to the defendant to whom it applies." (Tr. 1711).
 {¶ 33} The trial court sealed Jones' testimony, hence we cannot discuss his testimony. However, we have reviewed it and find that it may have been extremely difficult for the jury in this situation to consider Jones' testimony when determining Scott's guilt and then to completely disregard it when considering Breedlove's guilt. That said, that does not automatically lead to the conclusion that Breedlove's conviction must be reversed.
 {¶ 34} In State v. Moritz (1980), 63 Ohio St.2d 150, the Ohio Supreme Court examined Bruton. In that case, Sergeant Moritz and his co-defendant, Porter, a bailiff, were convicted of bribery at a joint trial where transcripts of Porter's recorded conversation suggesting a bribe were admitted into evidence as was testimony from a witness implicating "blue coats," a reference to police officers. Porter did not testify. Moritz sought to have his trial severed from Porter's trial based on Bruton, arguing that he could not cross-examine Porter and that the court's limiting instruction to the jury was ineffective.
 {¶ 35} The Ohio Supreme Court agreed that the statements implicated Moritz and did not afford him the right of confrontation. However, it held:
 {¶ 36} "Our conclusion that appellant was implicated in these two instances contrary to his right of confrontation does not, however, mean that his conviction is to be automatically reversed. The line of cases following Bruton have firmly established that an error of this sort may be harmless. In Schneble v. Florida (1972), 405 U.S. 427, 430, the Supreme Court declared:
 {¶ 37} "The mere finding of a violation of the Bruton rule in the course of the trial, however, does not automatically require reversal of the ensuing criminal conviction. In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the co-defendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error.' See, also, Harrington v. California (1969), *Page 9 
395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284; Parker v. Randolph (1979),442 U.S. 62, 99 S.Ct. 2123, 60 L.Ed.2d 713; and Elliott v. Thompson (C.A. 6, 1979), 599 F.2d 767, certiorari denied, 444 U.S. 932, 100 S.Ct. 278,62 L.Ed.2d 190." Id. at 155-56.
 {¶ 38} The Court advised that in this type of situation, separate trials should be granted to avoid such an issue arising. However, it found that in Moritz's case, "there was more than sufficient independent evidence of appellant's guilt to render admission of the contested statements harmless beyond a reasonable doubt." Id. at 156.
 {¶ 39} Likewise in State v. Love, 7th Dist. No. 02CA245,2006-Ohio-1762, we faced a similar situation. In that case, Love was tried jointly with his co-defendant, Blackshear, for aggravated murder. The jury convicted Love and acquitted Blackshear. Love appealed, arguing in part, that the trial court should have severed his trial from Blackshear's trial. Love argued that he was denied a fair trial based on Blackshear's presentation of a mutually antagonistic defense and that his joint trial violated Bruton.
 {¶ 40} We concluded that the defenses argued by the two defendants were mutually antagonistic because each defendant claimed that the other was responsible for the victim's death. Id. at ¶ 16-17. However, we stated that Love was also required to show that he was prejudiced by the joinder. Id. at ¶ 18. Love argued that he was prejudiced because the state played Blackshear's recorded statement in which Blackshear exculpated himself and inculpated Love. Love contended that because he was not able to cross-examine Blackshear, pursuant to Bruton, his conviction had to be reversed. The trial court did give a limiting instruction to the jury as to Blackshear's statement.
 {¶ 41} We concluded:
 {¶ 42} "Despite these instructions and whether or not they can be seen to adequately correct the error, the Ohio Supreme Court has held, `[a] violation of an accused's right to confrontation and cross-examination is not prejudicial where there is sufficient independent evidence of an accused's guilt to render improperly admitted statements harmless beyond a reasonable doubt.' Moritz, supra at paragraph two of the syllabus. *Page 10 
 {¶ 43} "In the matter at hand, there was more than enough other evidence demonstrating Appellant's guilt in Hubbert's death to render the trial court's error in failing to sever, while regrettable, ultimately not prejudicial.
 {¶ 44} "* * *
 {¶ 45} "Notwithstanding the lack of prejudice, however, we must stress concerns with the error presented here and the appearance from the record of unnecessary overreaching on the part of the prosecution. The error is only harmless in this case based on the other overwhelming evidence of Appellant's guilt." Id. at ¶ 25-26, 34.
 {¶ 46} Moritz and Love indicate that at this point we must engage in a harmless error analysis.
 {¶ 47} Harmless error is an outcome determinative test. State v.Johnson, 112 Ohio St.3d 210, 2006-Ohio-6404, ¶ 33; State v. Martin,103 Ohio St.3d 385, 2004-Ohio-5471, ¶ 51; State v. Brown, 100 Ohio St.3d 51,2003-Ohio-5059, ¶ 25. The Ohio Supreme Court has explained:
 {¶ 48} "Whether [the] error was harmless beyond a reasonable doubt is not simply an inquiry into the sufficiency of the remaining evidence. Instead, the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."State v. Conway, 108 Ohio St.3d 214, 2006-Ohio-791, ¶ 78.
 {¶ 49} At trial, three eyewitnesses testified against Breedlove — Anita Marshall, Ariel Brown, and Kenneth Findley.
 {¶ 50} Anita Marshall testified that on the morning of the shooting she was at Ariel Brown's, her sister, apartment on Griffith Street. The two were standing outside with some other girls when they noticed a burgundy car drive slowly by and later saw the same car drive up Griffith Street. (Tr. 574, 576). Marshall recognized the people in the car as Breedlove, Scott, and Richardson. (Tr. 574). Marshall stated that she knew all three men from going to school together and "around the neighborhood." (Tr. 575). She stated that Scott was the driver, Breedlove was on the passenger side, and Richardson was in the backseat. (Tr. 574-75). *Page 11 
 {¶ 51} Marshall stated that the girls also recognized another car. She stated that they saw a car, which she identified as Sholanda Bohazi's car, driving down Covington Street. (Tr. 577). At that time, Marshall stated that Breedlove's car was at the corner of Covington and Madison Streets and she saw it turn onto Covington Street. (Tr. 577-78). Marshall stated that Brown then took off running towards the two cars because Brown thought her ex-boyfriend was the one driving Bohazi's car. (Tr. 578-79). Marshall stated that she followed her sister and that was when the shooting started. (Tr. 579-80). Marshall stated that from her view on Covington where she was standing on the bridge, she saw Breedlove and Richardson shooting. (Tr. 580-81). She stated that although there is a guardrail and a fence on the bridge, she could see everything clearly. (Tr. 640). She indicated the victim has backed the car he was driving into a pole in what appeared an attempt to get away. (Tr. 581).
 {¶ 52} Marshall testified that Breedlove and Richardson then got out of the car. (Tr. 581). She testified that Breedlove was still shooting at this time but remained close to the car he had been riding in. (Tr. 581-82). Richardson, she stated, walked towards Revere, who was still in Bohazi's car, and continued shooting at him. (Tr. 582). After they stopped shooting, Marshall stated that she saw either Breedlove or Richardson drop a Black Mild cigar and a lighter on the ground, which was a sign of disrespect to the victim's mother. (Tr. 582, 591). Marshall stated that they then got back in their car and left the scene, again with Scott driving. (Tr. 582-83).
 {¶ 53} Marshall testified that a police officer came to her house a few days later with two photo arrays for her to look at. (Tr. 585). Out of the first photo array she identified Richardson and out of the second array she identified Scott as being two of the people she saw shooting at Revere. (Tr. 587). Marshall stated that the police did not show her a photo array with appellant's picture in it. (Tr. 587).
 {¶ 54} On cross-examination, Marshall stated that she physically saw appellant get out of the car and fire a gun. (Tr. 633). However, she admitted that she never told Detective Daryl Martin this fact when he questioned her. (Tr. 633-34). Marshall stated she never told Detective Martin because he never asked. (Tr. 634). She admitted that she told him that Richardson got out of the car because that is who Detective Martin asked her about. (Tr. 659). Additionally, Marshall admitted that although she testified *Page 12 
that she "saw" Breedlove fire shots, she "assumed" he was firing because she heard the shots. (Tr. 660). Finally, Marshall admitted that her focus at that time was on her sister because she was worried about her. (Tr. 629, 659-60).
 {¶ 55} Ariel Brown's testimony was the same as Marshall's regarding where the girls were and the two cars they saw. (Tr. 665-67). She too identified Breedlove, Scott, and Richardson and stated that Scott was the driver, Breedlove was in the front passenger seat and Richardson was in the back seat on the driver's side. (Tr. 667). Brown stated that she knew the men prior to this incident from growing up around them. (Tr. 668). Brown indicated that she thought her ex-boyfriend, Raymond Hammond, was driving the second car. (Tr. 670). She also thought it was suspicious that Breedlove, Scott, and Richardson were in the Westlake Project area. (Tr. 670-71). For this reason, Brown stated that she ran after the car she thought Hammond was driving. (Tr. 670-71).
 {¶ 56} When she approached the end of the bridge on Covington by Madison, Brown stated that she heard gunshots. (Tr. 671-72). She indicated that Revere was on Hayman Street close to Covington Street by this time and the defendants' car was at the corner of Hayman and Covington Streets. (Tr. 671). Brown testified that she first saw and heard gunfire coming from the car that Scott was driving. (Tr. 672-73). At that time, Brown stated that the gunfire was only coming from the passenger side of the car where Breedlove was seated. (Tr. 673). She stated that Breedlove was firing a weapon. (Tr. 674). Brown testified that she then saw Richardson exit the defendants' car, run up to the car that Revere was in, and shoot into it. (Tr. 673). Brown stated that Scott was the driver the entire time. (Tr. 674-75).
 {¶ 57} Brown testified that she went to the police station that day. At the police station, she was shown three photo arrays. Brown stated that she picked Breedlove, Scott, and Richardson out of the photo arrays. (Tr. 680).
 {¶ 58} On cross-examination, Brown admitted to some inconsistencies among her testimony, a statement that she gave to police, and testimony she gave at a motion to suppress hearing. The inconsistencies dealt with why she started running towards the car Revere was driving, where she was standing when she first heard shots fired, the fact that she did not write in her statement that she saw Breedlove *Page 13 
shooting, and the fact that she wrote in her statement that she saw one person, Richardson, get out of the car but she testified at the suppression hearing that she saw two people get out of the car. (Tr. 723-31).
 {¶ 59} Kenneth Findley was the third eyewitness to testify. He stated that on the day in question he left church and was driving on Covington Street towards Hayman Street when he heard shots being fired. (Tr. 817). He indicated that he saw one car back up into a pole and a burgundy car approach it. (Tr. 817). Findley stated that three people were in the burgundy car and that at least two of them were shooting. (Tr. 818). He testified that it seemed that the person in the backseat was shooting and that the person in the front passenger seat was shooting. (Tr. 819). Findley stated that when the burgundy car stopped, the person in the backseat got out and fired more shots at the car that had backed into the pole. (Tr. 823).
 {¶ 60} Findley stated that he saw the three men in the car but did not get a good look at them. (Tr. 827). He also stated that he knew who Breedlove, Scott, and Richardson were prior to the shooting. (Tr. 827). Next, Findley testified that Detective Martin brought a photo array to his house. (Tr. 827). Findley stated that he picked Breedlove's photo out of the array because he thought Breedlove was the man in the front passenger side of the car. (Tr. 828). However, Findley admitted that he was not sure if it was Breedlove he saw. (Tr. 828, 857). Findley also admitted that when he first talked with police, he indicated that he could not identify any of the men he saw in the car. (Tr. 836).
 {¶ 61} In addition to the above eyewitness, the state called numerous other witnesses whose testimony was relevant. Sholanda Bohazi, the owner of the car that Revere was driving, testified that she and Revere were friends. She stated that the night before the murder, Revere had spent the night at her house. (Tr. 748). Around noon the next day, Bohazi stated, Revere used her car to drop off her nephew at her mother-in-law's house. (Tr. 749). After dropping off her nephew, Bohazi stated, Revere called her and told her that he was at "some dude house" and that he sounded scared and upset. (Tr. 751). Bohazi testified that Revere told her that he was being followed by Breedlove, Scott, and Richardson. (Tr. 763). Bohazi stated that *Page 14 
approximately five minutes later she received a phone call that Revere had been shot. (Tr. 763-64).
 {¶ 62} Bohazi also testified that in the week prior to his death, Revere received a threat from Breedlove. (Tr. 755-56). She stated that Breedlove had left a message on Revere's pager, which he played for her, stating something to the effect of "he was gonna kill him" because of who he was "hanging with," which was Bohazi's brother-in-law. (Tr. 756). Bohazi stated that she recognized Breedlove's voice on the message. (Tr. 756). She stated that she knew Breedlove from going to school with him. (Tr. 754).
 {¶ 63} On cross-examination, Bohazi admitted that although she knew Breedlove, she had not had conversations with him or spoken with him on the telephone. (Tr. 774). Additionally, Bohazi admitted that she did not volunteer any information to police on the day of the shooting. (Tr. 777-78).
 {¶ 64} Regarding physical evidence found at the scene, Detective Martin testified that shell casings and a blunt type of cigar were found at the scene. (Tr. 968). Officer Robert Mauldin's testimony offered further testimony concerning the casings. He indicated that casings from two different weapons were found at the scene. (Tr. 875). However, he testified that some of the casings had been moved from their original positions. (Tr. 955). The casings that had been moved were 9mm and the others were .380mm. (Tr. 875). Jonathan Gardner, a firearms examiner for the Bureau of Criminal Identification and Investigation (BCI), testified that all of the 9mm casings had come from the same gun and all of the .380mm casing had come from the same gun. (Tr. 928, 931). He also testified that the bullets found in Revere's body and in his car were .380mm. (Tr. 932). Melissa Zielaskiewicz, a forensic scientist in the serology DNA section at BCI, offered further testimony regarding the cigar. She concluded that DNA found on that cigar belonged to Richardson. (Tr. 1082-83).
 {¶ 65} Finally, Robert Belding, the deputy coroner, testified that Revere's cause of death was hypovolemic shock due to a gunshot wound to the torso. (Tr. 1139). All of the above establishes that Breedlove was involved in the murder of Revere. While there may be some discrepancies between the eyewitnesses' testimony, two of the eyewitnesses, Marshall and Brown, positively identified Breedlove, Scott and *Page 15 
Richardson. The fact that each of these witnesses knew Breedlove and his co-defendants indicates that they would be less likely to misidentify them than someone who did not know them. Likewise, DNA evidence found on the cigar at the scene was a match for Richardson's DNA. This substantiated Marshall and Brown's identification of him and demonstrated that each had sufficient opportunity to view the men in the car. Furthermore, other evidence corroborated their identification of Breedlove. For instance, although Findley was not sure if it was Breedlove that he saw in the car, he thought it might be. Also, according to Bohazi, minutes before his death, Revere told her that Breedlove, along with Scott and Richardson, were following him. Furthermore, she testified that in the week prior to the shooting, Breedlove had threatened Revere.
 {¶ 66} Additionally, the evidence indicates that Breedlove was one of the shooters. Marshall and Brown indicated that he was shooting at the victim's car. Findley additionally stated that a person in the passenger front seat was shooting. Marshall and Brown indicated that Breedlove was in the front passenger seat of the car.
 {¶ 67} Consequently, given this evidence, we cannot find prejudice. The evidence of guilt is overwhelming.
 {¶ 68} That said, we note that the state, in this case, should have known of Scott's alibi defense prior to trial and accordingly it should have informed the trial court of its need to call Jones as a witness to rebut Scott's testimony. Scott filed a notice of alibi a month before trial. The trial did not begin until May 23, 2005. On April 26, 2005, Scott filed his notice of alibi. The state claimed that it did not receive this notice until the trial began. However, the notice was file-stamped and made a part of the record on April 26, 2005. There is no excuse for the state not knowing of the alibi defense and it is disingenuous to claim that it did not know. Therefore, at that point, the state should have known that it would have to call Jones as a rebuttal witness.
 {¶ 69} The trial court, in this instance, would have most likely severed the trials and thus eliminated the possibility of any prejudicial effect of joinder. The reason the court severed Breedlove's trial from Richardson's trial was because Richardson planned to call Jones as a witness. (May 2, 2005 Tr. 5). Likewise, the reason the court allowed a joint trial for Breedlove and Scott, was that the state represented that it *Page 16 
did not plan on calling Jones to testify and, therefore, noBruton issue would arise. (05/02/05 Tr. 4-6).
 {¶ 70} Regardless, in this instance, the error was harmless beyond a reasonable doubt. This assignment of error lacks merit.
 SECOND ASSIGNMENT OF ERROR {¶ 71} "THE DUE PROCESS CLAUSE OF THE UNITED STATES CONSTITUTION IS VIOLATED WHEN A DEFENDANT IS CONVICTED ON UNRELIABLE EYEWITNESS IDENTIFICATION."
 {¶ 72} Here, appellant argues that the eyewitness testimony in this case was unreliable, as is all eyewitness testimony. While appellant argues that the eyewitness testimony was unreliable, what he really seems to be arguing is that his conviction was against the weight of the evidence because the eyewitness testimony was not credible or reliable.
 {¶ 73} Under a manifest weight standard, the appellate court, "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction." State v.Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52, quoting State v.Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 74} Breedlove was convicted of aggravated murder in violation of R.C. 2903.01(A), which provides in part that "[n]o person shall purposely, and with prior calculation and design, cause the death of another." He was also convicted of a gun specification.
 {¶ 75} "[I]t is common knowledge in the legal world that eyewitness testimony, contrary to common sense, is often unreliable." State v.Weaver, 2d Dist. No. CIV.A. 20549, 2004-Ohio-5986, at ¶ 18. However, questions regarding the reliability of eyewitness identifications are best left to the jury. State v. Tonn, 2d Dist. Nos. 204-CA-36, 2004-CA-37, 2005-Ohio-2021, at ¶ 10. *Page 17 
 {¶ 76} The testimony is set forth in depth under the first assignment of error. As is explained under that assignment of error, while there are inconsistencies in some of the witnesses' testimony, the evidence clearly indicates that Breedlove was involved in this crime. Furthermore, it shows that he was one of the shooters. Additionally, Bohazi's testimony that Revere received a death threat from Breedlove a week prior to his death, is evidence of prior calculation and design. Thus, considering all the testimony, the conviction for aggravated murder and a gun specification was not against the manifest weight of the evidence. This assignment of error lacks merit.
 THIRD ASSIGNMENT OF ERROR {¶ 77} "APPELLANT AND THE PUBLIC WERE DENIED A PUBLIC TRIAL WHEN THE TRIAL COURT CLOSED THE COURTROOM IN CONTRAVENTION OF U.S. CONST. AMEND, VI AND XIV AND OHIO CONST. ART. I, §§ 2, 10, AND 16."
 {¶ 78} This assignment of error raises issue with the trial court's partial closure of the courtroom during Jones' testimony. We addressed this exact argument in Scott's appeal and found that it lacked merit.State v. Scott, 7th Dist. No. 05MA215, 2007-Ohio-6258, ¶ 13-31. We explained:
 {¶ 79} "The Sixth Amendment to the United State Constitution provides in part:
 {¶ 80} "`In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial.' This right is also set out in the Ohio Constitution, Article I, Section 10: `In any trial, in any court, the party accused shall * * * have * * * a speedy public trial.' Public trials ensure that the judges and prosecutors carry out their duties responsibly, encourage witnesses to come forward, and discourage perjury. Waller v. Georgia (1984), 467 U.S. 39, 47, 104 S.Ct. 2210, 81 L.Ed.3d 31 citing In re Oliver (1948), 333 U.S. 257, 270, 68 S.Ct. 499,92 L.Ed. 682.
 {¶ 81} "Nonetheless, the right to a public trial is not an unconditional right, and may be overridden by a more dominant interest. Id. The right to a public trial is not absolute, and in some instances must yield to other interests, such as those essential to the administration of justice.' State v. Drummond, 111 Ohio St.3d 14,854 N.E.2d 1038, 2006-Ohio-5084, at ¶ 51.
 {¶ 82} "Once a party objects to a court's decision to close the courtroom during trial, the Sixth Amendment requires application of a four-prong test as set forth in *Page 18 Waller, supra. State v. Alexander, 7th Dist. No. 03-CA-789,2004-Ohio-5525, at ¶ 20. `First, the party seeking to close the trial or some portion of it must assert an overriding interest. Second, any closure must be narrowly tailored to protect that interest. Third, the trial court must consider reasonable alternatives to closing the courtroom. Finally, the court must make findings on the record adequate to support the closure.' Id.
 {¶ 83} "Recently in Drummond, supra, the Ohio Supreme Court addressed the issue of closing a courtroom to the public. In Drummond, the judge closed the courtroom during the cross-examination of one witness and the testimony of two other witnesses. The media was permitted to remain in the courtroom during this time. Relying on federal case law, the Court stated that when a trial judge orders a partial, instead of a total closure of a court proceeding, a `substantial reason' rather thanWaller's `overriding interest' will justify the closure.Drummond, 2006-Ohio-5084, at ¶ 53.
 {¶ 84} "The Court in Drummond concluded that the trial court's closure order complied with Waller, supra. As to the first factor, the Court noted that there had been a physical altercation between a spectator and courtroom deputies, and that a second incident occurred in the judge's chambers. Id. at ¶ 54. The Court further pointed to the trial court's finding that `the fear of retaliation expressed by various witnesses' was a basis for its action. Id. The case involved gang-related activity and the Court acknowledged the dangerous nature of gang violence and the need to protect witnesses testifying against gang members from the threat of retaliation. Id. Thus, the Court concluded that the trial court had a substantial reason to close the courtroom.
 {¶ 85} "As to the second factor, the Drummond Court found that the closure was no broader than necessary. Id. at ¶ 55. It noted that the trial court only closed the courtroom for the cross-examination of one witness and the testimony of two other witnesses. Id. The Court also pointed out that while spectators had to vacate the courtroom, the media was permitted to remain. Id. It emphasized the fact that media presence helped to safeguard Drummond's right to a public trial because the witnesses' awareness of the media minimized the risk that they would alter their testimony. Id. *Page 19 
 {¶ 86} "As to the third factor, the Court observed that the record did not show the trial court considered alternatives to closure. Id. at ¶ 57. However, the Court did not find this significant because this was only a partial closure during cross-examination of one witness and the testimony of two others. Id.
 {¶ 87} "And as to the fourth factor, the Court noted that the trial court stated there had been a physical altercation between spectators and courtroom deputies, it mentioned another incident had occurred in the judge's chambers, and witnesses had expressed fear of retaliation by testifying in open court. Id. at ¶ 58. The Court found these reasons a bit lacking; however, it went on to state that the strength of the judge's actual findings must be evaluated in reference to the limited scope of the closure. Id. at ¶ 58. The Court concluded: `Under these circumstances, where there is an interest in maintaining courtroom order and security, the trial court did not abuse its discretion in ordering the limited closure of the courtroom.' Id.
 {¶ 88} "Like the Ohio Supreme Court in Drummond, we must consider theWaller factors. In this case, the judge did not close the courtroom to the media and its closure to the public was only during the testimony of one material witness and another witness whose testimony was ancillary to Jones' testimony. Thus, like Drummond, this case involved a partial, instead of a total closure of the courtroom. Therefore, the state only had to present a substantial reason for seeking to close the courtroom instead of an overriding interest. It did so. The state informed the court of the alleged threat to Jones' family, which was supposedly made on the morning that Jones was to testify. The court noted two other reasons in the sealed record that lent further support to the prosecutor's request. Given these circumstances, a substantial reason existed to close the courtroom during Jones' testimony.
 {¶ 89} "Secondly, the closure was narrowly tailored in this case. This trial lasted over a week and twenty witnesses testified. The court only closed the courtroom for two witnesses' testimony — Jones and another witness whose testimony was secondary to Jones' testimony. Furthermore, the court allowed the media to remain in the courtroom during its closure. As the Supreme Court noted in Drummond, by allowing the media to remain, appellant's right to a public trial was further safeguarded. *Page 20 
 {¶ 90} "Thirdly, the record does not demonstrate that the trial court considered alternatives to closing the courtroom. However, failing to do so does not lead to the conclusion that appellant's right to a public trial was violated. The Supreme Court excused this failure inDrummond given the fact that the case involved only a partial closure during cross-examination of one witness and the testimony of two other witnesses. In this case, the courtroom was closed for an even shorter period of time. Thus, the court's failure to consider alternatives does not lead to the conclusion that appellant's right to a public trial was violated.
 {¶ 91} "Finally, after reviewing the court's findings, we conclude that they were adequate to support the closure. While the court could have made more detailed findings, its reasons for closing the courtroom were at least as substantial, if not more substantial, than those given by the trial court in Drummond. And while the Supreme Court made clear that it would have preferred more detailed findings by the trial court in Drummond, it nonetheless concluded that under the circumstances, where courtroom order and security were involved and where the scope of the courtroom closure was limited, the trial court did not abuse its discretion. It follows that in this case too, the trial court did not abuse its discretion in closing the courtroom for the limited purpose of Jones' testimony." Scott, 7th Dist. No. 05MA215, 2007-Ohio-6258, ¶ 18-29.
 {¶ 92} Thus, for those same reasons, this assignment of error lacks merit.
 {¶ 93} For the foregoing reasons, the judgment of the trial court is hereby affirmed.
Donofrio, J., dissents; see dissenting opinion. Waite, J., concurs.